671 A.2d 99

**Donald Patrick TOFT**

v.

**STATE OF NEVADA, ex rel. Ali PIMENTEL.**

**No. 711, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Feb. 7, 1996.

Alan Hilliard Legum, Annapolis, for Appellant.

Angela M. Eaves, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellee.

Argued before BLOOM, FISCHER and HARRELL, JJ.

HARRELL, Judge.

Appellant, Donald P. Toft, appeals from a judgment in the Circuit Court for Anne Arundel County, wherein a jury, presided over by Judge Lawrence H. Rushworth, found that he fathered a daughter born to appellee, Ali Pimentel, and the court subsequently entered an order requiring him to pay child support. For the reasons set forth below, we shall affirm the judgment of the circuit court.

## ISSUES PRESENTED

Appellant presents four issues for our resolution on appeal, which we have rephrased for analysis as follows:

I.  Did the circuit court err by admitting the blood test report into evidence:

(A) Based upon the alleged failure of the court to "select" the laboratory that performed the blood tests?

(B) Based upon the alleged failure of the laboratory to follow industry standards or its own internal standards?

II.  Did the circuit court err in denying appellant's motion for judgment at the close of all evidence because the presumption of legitimacy contained in Md.Fam.Law Code Ann. § 5–1028(c) had not been rebutted?

III.  Did the circuit court err by failing to give appellant's requested jury instructions regarding the presumption of legitimacy and the admissibility of blood tests?

IV.  Did the circuit court err by conducting a child support hearing immediately following the conclusion of the paternity trial?

## FACTS AND PROCEEDINGS BELOW

On 31 July 1989, appellee gave birth to a child, subsequently named "Alexandria Jordan Toft" ("Alexandria"). During the period (stipulated by the parties) within which this child was conceived, i.e., from 20 October 1988 until 2 November 1988, appellee was married to one Michael Wayne Williamson, but

they lived separate and apart from one another.[1] Appellee first met appellant in the middle of October, 1988, in Virginia Beach, Virginia, where they were both residing. Almost immediately, appellee and appellant began a sexual relationship. Appellee also engaged in ongoing sexual intercourse with another man, David Turner, beginning on either 5 or 7 November 1988. Although appellant was cognizant of appellee's relationship with Mr. Turner, his sexual relationship with appellee did not cease until the end of November, or early December, 1988.

In January of 1989, appellee informed appellant that she was pregnant, and that she believed the child was Mr. Turner's. One day after Alexandria was born, appellee contacted appellant, and indicated to him that he was the father of the child.

Although there is no direct evidence contained in the record, the parties are in apparent agreement that, on 6 December 1991, another judge, in a separately numbered case, signed an order requiring appellee, Alexandria, and appellant to submit to blood tests in order to determine exclusion and/or the statistical probability of appellant's paternity.[2] The record

---

1. Whether appellee's testimony as to non-access was entitled to be considered on the ultimate question put to the jury depends on our resolution of issues I and II, *infra*. Mr. Williamson was not a party to the instant case.

2. The only evidence of this order contained in the record is from the transcript of the 17 January 1995 trial, where the following references are made. While opposing appellant's motion for judgment at the close of appellee's case-in-chief, the State's Attorney's Office for Anne Arundel County, counsel for appellee stated:

   [T]he [6 December 1991] order signed by Judge Lerner says that "[appellee], the minor child, Alexandria J. Toft, and [appellant] are hereby ordered to submit to an HLA blood test to determine exclusion or statistical probability of [appellant's] paternity. Said blood test shall be arranged through the Domestic Relations Division of this Court and shall take place at the Domestic Relations Division.... The cost to be ... assessed against the nonprevailing party."

   In addition, responding to a question by appellant's counsel regarding who selected the laboratory which performed the blood tests, the laboratory supervisor stated:

does not reflect that Mr. Williamson, appellee's husband, or Mr. Turner submitted to any blood test vis à vis Alexandria and her paternity.

On 30 September 1992, appellee filed the instant Uniform Support Petition in the Circuit Court for Anne Arundel County, naming appellant as the father of her child. The petition sought establishment of paternity in appellant, an order for child support, and medical coverage for Alexandria. Appellant answered the petition, alleging that he was not Alexandria's father and that there was no basis for a claim against him for child support and medical coverage.

A two day jury trial on the paternity portion of appellee's petition commenced on 17 January 1995. Appellee's expert witness, Francis Chiafari, a molecular biologist and supervisor in the DNA laboratories of the Baltimore Rh Typing Laboratory ("Baltimore Rh Lab"), where the blood tests were performed in this case, began to testify regarding the test results when appellant's counsel objected to their admission. The basis for this objection was that Baltimore Rh Lab was not "selected" in accordance with Md.Fam.Law Code Ann. ("FL") § 5–1029(b).[3] After several bench conferences with counsel

---

I have a letter dated [30 January 1992], from a Laura Kaufman, Assistant State's Attorney for Anne Arundel County, saying that "I have rescheduled [appellant] in the above captioned case for blood testing on [30 March 1992] to the Domestic Relations Division" and the—the name on the case is Pementel [sic] versus Toft, URESA C91–00216.

3. FL § 5–1029(b) (Supp.1995) states as follows:

(b) *Approved laboratory required.*—The blood or genetic tests shall be made in a laboratory selected by the court from a list of laboratories provided by the Administration.

"Administration" as used in the above section refers to the Child Support Enforcement Administration of the Department of Human Resources. FL §§ 5–101, 5–1001. Furthermore, Laws of Maryland 1994, ch. 113, §§ 3, 5 make clear that the section, as codified above, is effective from 1 July 1994, and applies prospectively to any child support orders issued or modified after that date. Thus, in this case, while the petition was filed on 30 September 1992, no child support order had been issued by 1 July 1994, so the revised statute was in effect for the January, 1995 proceedings.

and some further testimony by Mr. Chiafari, the court over-ruled the objection.[4]

Mr. Chiafari testified that tests were performed in both an Human Leukocyte Antigens ("HLA") laboratory and a DNA laboratory, and based upon the results of the tests: (1) appellant could not be excluded as a possible father of Alexandria; (2) the probability of appellant's paternity was 99.9%; (3) it was extremely likely that appellant was Alexandria's father; and (4) the genetic markers would exclude 99.96% of the men falsely accused of paternity in this case. Over objection, the blood test report was moved into evidence by appellee.

On cross-examination of Mr. Chiafari, testimony was elicited that Baltimore Rh Lab is certified by the American Association of Blood Banks ("AABB"), and subscribes to the standards set forth by the AABB, including its requirements that: (1) methods be available to identify specimens collected from a facility outside of the laboratory conducting the tests; (2) the blood samples be identified with a firmly attached label bearing a unique identification for each individual and the collection date; and (3) the phlebotomist's name must be part of the permanent record of each sample. In addition, Mr. Chiafari testified that Baltimore Rh Lab has its own internal standard that requires all blood samples received from other laboratories to be drawn on Monday, Tuesday, or Wednesday only, and be received by Baltimore Rh Lab within 24 hours of drawing.

The blood samples from appellee and Alexandria were drawn on 12 May 1993 in Las Vegas, Nevada, but not received by Baltimore Rh Lab until 14 May 1993, in contravention of its

---

4. The court was provided another opportunity to consider the merits of appellant's FL § 5–1029(b) objection when appellant made a motion for judgment at the close of appellee's case. Before ruling on this motion, the court heard evidence that Baltimore Rh Lab was selected by a prior court order. *See* n. 2. In denying this portion of appellant's motion, the court found that the statute was satisfied because of the existence of the prior court order, and accordingly, concluded that there was no reason to strike the already-admitted blood test report.

own internal standard. On re-direct examination, however, Mr. Chiafari stated that the samples could be as old as three days without any deleterious effects on the accuracy of the tests. The documentation sent by the Las Vegas collecting facility did not indicate which tubes were drawn from the minor child, and although it provided the name and signature of the phlebotomist who drew the sample from appellee, this information was omitted from the appropriate blank in the form for Alexandria's sample. Mr. Chiafari testified, nevertheless, that the other information on the form indicated to him that the same phlebotomist drew both appellee's and Alexandria's samples.

Following the testimony of Mr. Chiafari, both appellee and appellant testified at trial consonant with the above-described facts that were within their scope of personal knowledge. Particularly with regard to appellee, as we noted *supra,* testimony was received, without objection, that she and her husband had been living separate and apart since June, 1988. Apparently, she had been living in California, Nevada, and Virginia at various times, while he had been living in Texas.[5]

At the conclusion of the evidentiary phase of the trial, appellant moved for judgment based upon the alleged failure of appellee to overcome the "rebuttable presumption" contained in FL § 5–1028(c)(1) "that the child is the legitimate child of the man to whom its mother was married at the time of conception." The trial court denied this motion.

After providing the jury general instructions, the trial judge proceeded to give specific instructions relative to paternity actions. The court instructed the jury that the blood tests were admissible if they both excluded 97.3% of supposed fathers and had a 97.3% probability of appellant's paternity. He further instructed that blood tests results above 97.3% are prima facie evidence of paternity, and that a "laboratory report received into evidence establishing a statistical proba-

---

5. Appellee and Mr. Williamson were divorced on 3 May 1989. The decree of divorce was silent as to whether any children were born of the marriage.

bility of the alleged father's paternity of at least [99.0%] constitutes a rebuttable presumption of his paternity." After explaining what a rebuttable presumption means, the court gave the following instruction regarding the presumption of legitimacy:

There is ... a rebuttable presumption also that a child is the legitimate child of a man to whom its mother was married at the time of conception. This presumption may be rebutted by the testimony of a person other than the mother or husband, that the husband and the wife were living separate and apart, *or by the introduction of evidence of genetic blood testing.*

(Emphasis supplied). Appellant's counsel excepted to the emphasized portion of the above instruction, and additionally excepted to the refusal of the court to give the following proposed instruction:

Maryland law states that the blood tests shall be made in a laboratory selected by the court from a list of laboratories provided by the [Child Support Enforcement] Administration. If you find that the laboratory was not selected by the court from a list of laboratories provided by the Administration, then you shall disregard the laboratory report and testimony of the expert witness.

Both of appellant's exceptions were overruled by the court, and the case was submitted to the jury. After approximately twenty minutes of deliberation, the jury returned its verdict, concluding that appellant was Alexandria's father.

Immediately following the jury verdict declaring appellant's paternity on 18 January 1995, the court commenced the child support hearing. Appellant objected to the child support hearing, based upon FL § 5–1037, which provides that "[t]he court may not enter an order under this subtitle against a party unless the party is given reasonable notice and an opportunity to be heard." Appellant contended that the only notice he received pertained to the jury trial on the issue of paternity, and that he received no notice that a child support hearing would follow the trial if the jury determined that he

was Alexandria's father. The circuit court overruled appellant's objection and proceeded to take testimony from the parties regarding their respective incomes, day care costs, medical insurance, and the costs of blood tests. Employing the Child Support Guidelines set forth in FL § 12–201 *et. seq.*, the court ordered appellant to pay $372.00 per month in child support and $327.00 for the cost of blood tests.

Appellant filed a timely appeal to this Court. Additional facts will be supplied as necessary in our analysis of the issues raised.

## *ANALYSIS*
### STATUTORY CONSTRUCTION

As the resolution of a majority of the issues presented on this appeal depend on our interpretation of the applicable statutes, a brief discussion is warranted on the guiding principles involved therein. The cardinal rule of statutory construction is to effectuate and carry out legislative intent. *E.g., Taxiera v. Malkus,* 320 Md. 471, 480, 578 A.2d 761 (1990) (citations omitted). Statutes are enacted to further an underlying goal, aim, or purpose, and must be interpreted in accordance with their general purposes and policies. *E.g., Motor Vehicle Administration v. Gaddy,* 335 Md. 342, 346, 643 A.2d 442 (1994) (citations omitted). We look first to the statutory language itself, since those words, given their generally understood meaning, are the most convincing evidence of legislative intent. *E.g., Comptroller v. Jameson,* 332 Md. 723, 732–33, 633 A.2d 93 (1993) (citations omitted). In addition, we look to the "context," or legislative history of a statute, including the statute's relationship to earlier or subsequent legislation, as an aid in determining legislative intent. *Rose v. Fox Pool Corp.,* 335 Md. 351, 360, 643 A.2d 906 (1994) (citing *Maryland Nat'l Bk. v. Pearce,* 329 Md. 602, 619, 620 A.2d 941 (1993)) (quoting *Kaczorowski v. City of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987)); *Jameson, supra,* 332 Md. at 733, 633 A.2d 93 (citations omitted). Furthermore, "where two statutes purport to deal with the same subject matter, they must be

construed together as if they were not inconsistent with one another," giving "full effect to both statutes, even where they were enacted at different times and without relation to one another." *Taxiera, supra,* 320 Md. at 481, 578 A.2d 761. With these principles in mind, we turn to consider the issues presented.

## I.

### (A)

Appellant contends that FL § 5–1029(b), set forth in n. 3, *supra,* required that the trial judge in this case personally select the particular laboratory that performed the blood testing from a list of laboratories provided by the Child Support Enforcement Administration.[6] Inasmuch as Judge Rushworth did not make this selection, appellant posits that the blood test report was therefore inadmissible. We disagree.

It is our view, derived from the plain language of the statute, that FL § 5–1029(b) is concerned with the proper procedure for ordering of blood tests, not their admissibility at a later point in time. Admissibility of blood test reports is governed by FL § 5–1029(e), set forth and discussed in section I.(B), *infra.* Accordingly, if appellant disputed the propriety of the laboratory selection, the time for objection was when the testing was ordered, i.e., apparently on 6 December 1991. As the record before us contains no indication of a prior objection to the order when it was entered, we consider the FL § 5–1029(b) objection not to have been timely made in this case, and we see no error in its being overruled.

In any event, were we to decide specifically appellant's contention, we would not hold it to be cause for reversal. At

---

6. Moreover, appellant asserts that the statute does not allow the Assistant State's Attorney representing appellee or the Domestic Relations Division of the circuit court to select the laboratory. Appellant contends also that the court does not have the discretion to order that any other entity select the lab—it must be ordered by the court itself. These arguments are addressed, *infra.*

trial, in an effort to prove that the prior order was in fact properly made, appellee's counsel submitted to the trial judge the list of approved laboratories compiled by the Child Support Enforcement Administration. Baltimore Rh Lab was the first laboratory named on the list. Appellant does not dispute that Baltimore Rh Lab is fully approved for court usage by the Child Support Enforcement Administration. In addition, the reference to the 6 December 1991 order by Judge Lerner,[7] read into the record by appellee's counsel, indicates that "[appellee], the minor child, Alexandria J. Toft, and [appellant] are hereby ordered to submit to an HLA blood test to determine exclusion or statistical probability of [appellant's] paternity. Said blood test shall be arranged through the Domestic Relations Division *of this Court.*" (Emphasis Supplied). This is a predictable and acceptable form of laboratory selection under the statute. We do not believe that the legislature envisioned that a trial judge would keep an updated list of laboratories under his or her control and name a specific laboratory in each and every order that he or she enters for blood tests. Continuous scheduling duties and the ongoing updating of the list of approved laboratories would, practically speaking, preclude or severely limit the effectiveness of this option. Rather, it is better reasoned that the Child Support Enforcement Administration, the agency specifically charged with the duty of keeping a list of laboratories that meets the current standards, provide that list to the various court agencies that routinely deal with the types of cases where such laboratory work is required, e.g., the Domestic Relations Division of the Anne Arundel County Circuit Court.[8]

---

7. We perceive no violation of FL 5–1029(b) in the instant case because the order was entered by a different judge in a prior, separately numbered case.

8. We note that although appellant argues that the involvement of the State's Attorney's office violated the statute, the record is unclear regarding what specific role, if any, was played by the particular Assistant State's Attorney for Anne Arundel County in ordering blood tests in this case, save the one reference to the transcript in n. 2, *supra.*

■ In any event, even assuming, *arguendo,* that our view of the legislative design of FL § 5–1029(b) is somehow misguided, and the circuit court erred by failing to adhere to the statute's requirements, appellant has not demonstrated how he was harmed or prejudiced by it in any way. The laboratory that performed the blood tests was on the list compiled by the Child Support Enforcement Administration. With the exception of his claims discussed in section I.(B), *infra,* appellant does not contend that the *selection* of Baltimore Rh Lab tainted the results of the blood tests, or that the results would have been different if the trial judge would have selected the laboratory. We will not reverse a civil judgment unless the complaining party shows error *and* prejudice. *E.g., Harris v. Harris,* 310 Md. 310, 319, 529 A.2d 356 (1987) (citing *Beahm v. Shortall,* 279 Md. 321, 330, 368 A.2d 1005 (1977)).

## (B)

■ Appellant contends additionally that the blood test results were inadmissible because they failed to meet AABB standards and Baltimore Rh Lab's own internal collection standards. FL § 5–1029(e) governs the admissibility of, and certain burdens and presumptions relating to, blood test reports, and provides, in pertinent part:

*(e) Laboratory report as evidence.*—(1) Subject to the provisions of paragraph (3) of this subsection, the laboratory report of the blood or genetic test shall be received in evidence if:

(i) definite exclusion is established; or

(ii) the testing is sufficiently extensive to exclude 97.3% of alleged fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3%.

---

As we are disposing of this issue on the grounds that the improper selection argument was irrelevant to the circuit court's consideration of the admissibility of the blood test report, or that any alleged error has not been shown to prejudice appellant, we need not explore further this argument.

(2) A laboratory report is prima facie evidence of the results of a blood or genetic test.

(3)(i) Subject to the provisions of paragraph (ii) of this paragraph, the laboratory report of the blood or genetic test is admissible in evidence without the presence of a doctor or technician from the laboratory that prepared the report if the report:

1. is signed by the doctor or technician who prepared or verified the report; and

2. states that the result of the blood or genetic test is as stated in the report.

(ii) When the laboratory report of the blood or genetic test is admitted in evidence, a doctor or technician from the laboratory that prepared the report is subject to cross-examination by any party to the proceeding if the party who desires cross-examination has subpoenaed the doctor or technician at least 10 days before trial.

(4) A laboratory report received into evidence establishing a statistical probability of the alleged father's paternity of at least 99.0% constitutes a rebuttable presumption of his paternity.

FL § 5–1029(e) (Supp.1995).[9]

We begin our analysis of this particular contention by considering whether the requirements of FL § 5–1029(e)(1) were met. The record reveals that the degree of statistical accuracy of appellant's paternity (99.9% probability), and that of exclusion of those that would be falsely accused (99.96%), exceeds the statutory thresholds for admissibility. *See Sider v. Sider,* 334 Md. 512, 516 n. 5, 639 A.2d 1076 (1994); *Eagan v. Ayd,* 313 Md. 265, 274–76, 545 A.2d 55 (1988) (held that

---

9. *See* n. 3, *supra* (the portion dealing with the 1994 revisions to the Family Law article, Laws of Maryland 1994, ch. 113, §§ 3, 5, in terms of their effective date, and their applicability in this case). The above quotation also reflects a technical syntax modification made to section (e)(3)(ii), reflecting its current codification ("cross-examination" instead of "cross examination"), which was not in effect at the time of the instant case. Laws of Maryland 1995, ch. 3, § 1.

contempt power could be used to compel a reluctant putative father to take blood test and, while discussing the legislative history of blood test usage, stated: "Given these legislative goals *and the fact that a test which complies with the conditions of [FL] § 5–1029(e) must be admitted into evidence. . . .*") (emphasis supplied). The high degree of statistical reliability even implicates FL § 5–1029(e)(4), which, on its face, triggers a rebuttable presumption of appellant's paternity, discussed *infra.* Thus, the blood test report admitted in this case comports with all of the statutorily-defined criteria for admissibility.[10]

Nevertheless, appellant argues essentially that admissibility of the blood test report is precluded, not by the statute, but by the evidence elicited by appellant's counsel on cross-examination,[11] after the report had already been admitted, that the laboratory failed to follow AABB standards, as well as its own internal standards. The statute makes no mention of adhering to specific standards of the AABB or other blood-testing industry group, or of the particular laboratory's own internal standards, which may exceed those of the AABB. Accordingly, the failure of a laboratory to follow AABB standards, in and of itself, has no bearing on the admissibility of blood test reports coming from that laboratory, provided that all of the other statutory requirements have been met—as they were in this case. As these are not criteria for admissibility under the statute, if relevant at all, non-adherence ordinarily would go

---

**10.** We note that FL § 5–1029(e)(3) allows a report to be admitted, without supporting testimony by a laboratory doctor or technician, if it contains a signature by the doctor or technician who prepared or verified the report, and if the report states that the result of the blood test is in concordance with the blood test report sought to be admitted. In this case, appellee did not need to rely on this portion of the statute because it presented the testimony of Mr. Chiafari, who indicated that the report was signed by two of the verifying technicians of the laboratory. Appellant does not allege on appeal that the criteria specified in paragraph (3) were offended by the report.

**11.** Appellant was permitted to engage in cross-examination only because appellee chose to call Mr. Chiafari as a witness. *See* FL § 5–1029(e)(3)(ii), *supra.*

only to the weight afforded the test results by the jury. Appellant does not, and based upon this record could not, argue that he was not given an opportunity to attempt to discredit the accuracy of the test results.[12]  Of course, admissibility is a separate concern from the weight to be given blood test evidence, and the blood test report was properly admitted in this case.

## II.

Appellant argues that the trial court erred in denying his motion for judgment at the close of all evidence because appellee failed to overcome the presumption contained in the paternity statutes that a child is the legitimate child of the man to whom the mother was married at the time of conception.

Our standard of review for the denial of a motion for judgment involves performing essentially the same analysis as the trial court, i.e., we must consider whether the evidence, including the logical inferences to be drawn therefrom, viewed in the light most favorable to the non-moving party, was legally sufficient to generate a jury question. *E.g., James v. General Motors Corp.,* 74 Md.App. 479, 484, 538 A.2d 782, *cert. denied,* 313 Md. 7, 542 A.2d 844 (1988) (and cases there cited). The legitimacy presumption is contained in FL § 5–1028(c), which provides:

12.  We note that Mr. Chiafari did his part to minimize the impact of the alleged failure to follow standard procedures on the accuracy of the tests.  For example, when appellant's counsel pointed out the lack of a phlebotomist's name and/or signature from the blank in the collection form next to Alexandria's name, Mr. Chiafari indicated that he was assured, based upon the other information contained on the form, that the same phlebotomist who was listed as drawing appellee's sample, also drew Alexandria's.  Similarly, while Mr. Chiafari admitted that the samples were not received by Baltimore Rh Lab within 24 hours of their drawing as the internal standard requires, he stated that the samples could be as old as three days without resulting in any adverse effects on the accuracy of the HLA test, and that the laboratory has successfully performed DNA tests on samples as old as six months, and one year.

(1) There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception.

(2) The presumption set forth in this subsection may be rebutted by the testimony of a person other than the mother or her husband.

(3) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, it is not necessary to establish nonaccess of the husband to rebut the presumption set forth in this subsection.

(4) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, both the mother and her husband are competent to testify as to the nonaccess of the husband at the time of conception.

The stool that appellant constructs to support his argument has two legs. The first is that the Court of Appeals "has never held that blood tests may be used to rebut the legitimacy presumption under the paternity statute," and the second is based upon his claim that the statute continues to require "third party testimony that the husband and wife were living separate and apart at the time of conception" in order to rebut the presumption of legitimacy. When called upon to bear the full weight of our scrutiny, the stool topples.

Appellant is correct that Maryland's highest court has yet to hold explicitly that blood tests may be used to rebut the presumption of legitimacy contained in FL § 5–1028(c).[13] In *Turner v. Whisted*, 327 Md. 106, 607 A.2d 935 (1992), the Court of Appeals, while considering the ability of a putative biological father of a child born to a married woman to order blood tests to establish his paternity, concluded that "the Court of Special Appeals was in error in its determination that

---

13. It appears that this precise issue was argued before the Court of Appeals in *Mattingly v. Shifflett*, 327 Md. 337, 609 A.2d 329 (1992), but the merits were not reached because the appeal was not taken from a final judgment.

blood tests could not be used to rebut the legitimacy presumption." *Id.* at 117, 607 A.2d 935. We are cognizant that *Turner* proceeded under the Estates and Trusts Article, and not the paternity statutes of the Family Law Article at issue here. As was recognized in *Turner,* paternity may be established under either the Family Law Article or the Estates and Trusts Article. *Id.* at 112, 607 A.2d 935. Both articles contain an express provision that a child conceived [14] during wedlock is presumed to be the legitimate child of both spouses. Md. Est. & Trusts Code Ann. § 1–206; FL § 5–1028(c). Furthermore, the Court of Appeals quoted with approval the proposition, dealing with the availability of a paternity determination via an equitable action under the Estates and Trusts Article, as opposed to the paternity statutes, that "the rules of evidence controlling the proof of paternity ought to be the same in either case." *Turner,* 327 Md. at 113, 607 A.2d 935 (quoting *Shelley v. Smith,* 249 Md. 619, 630, 241 A.2d 682 (1968)). *Turner* also involved a different array of parties than does the instant case, thus presenting a different set of dynamics for the ebb and flow of the legal principles jousting for the advantage to dictate an outcome. In *Turner,* the mother's husband, as well as the putative biological father, were before the court. Thus, a blood test of the husband might more conclusively rebut the presumption of legitimacy by tending to exclude him as the father than would a test of the putative father that tends to inculpate him. Although in the instant case, no blood test results for only the child, mother, and putative father can conclusively prove that the *mother's husband* was *not* the father, such results would tend to indicate to some degree of probability that *appellant is* the father. What we are concerned with here is not whether the blood test results conclusively prove anything to an absolute certainty, but rather whether those results carry sufficient probative weight to rebut the presumption of legitimacy, thereby open-

---

14. The presumption contained in Md. Est. & Trusts Code Ann. § 1–206 encompasses a child *either* born or conceived during wedlock; the FL § 5–1028(c) presumption only applies to a child conceived during wedlock.

ing the door for the mother to testify as to non-access of the husband at the time of conception, and permitting the jury to return a supportable verdict of appellant's paternity. Concerning this, more will be said anon.

Prior caselaw aside for the moment, when considering the statute itself, its legislative history, and its relation to other paternity statutes, we find support for the proposition that the use of blood tests to rebut the legitimacy presumption was contemplated by the drafters of the statute. Before its amendment in 1988, the statute required that evidence must be "shown that the mother and husband lived separate and apart at the time of conception" in order to rebut the presumption.[15] The above-quoted language was explicitly removed, and the statute now allows the presumption to be "rebutted by the testimony of a person other than the mother or her husband." FL § 5–1028(c)(2); *see* Laws of Maryland 1988, ch. 657 § 1. The legislative history of the 1988 amendment is illustrative. The stated purpose of the revision was to "[broaden] the rebuttal to the presumption that a child is the legitimate child of the man to whom the child's mother is married." Laws of Maryland 1988, ch. 657 § 1. Furthermore, the Floor Report prepared by the Senate Judicial Proceedings Committee reveals that "[t]estimony indicated that the blood tests developed to establish paternity are very accurate and that this bill allows testimony relating to blood test results to be admitted into evidence." S.Flr.Rpt., H.B. 485 (1988). Similarly, notes taken by the House Judiciary Committee indicate that the revision "would remove the limi-

---

**15.** The cases cited by appellant to support his claim that third party testimony that the husband and wife were living separate and apart at the time of conception is still required, i.e., *Shelley v. Smith, supra,* 249 Md. at 621–23, 241 A.2d 682 (1967); *Corley v. Moore,* 236 Md. 241, 245–46, 203 A.2d 697 (1964); *Staley v. Staley,* 25 Md.App. 99, 109, 335 A.2d 114, *cert. denied,* 275 Md. 755 (1975); *Downes v. Kidwell,* 14 Md.App. 92, 95–96, 286 A.2d 199 (1972), were all decided before the statute was amended, and therefore are no longer persuasive for that proposition. They are, however, discussed, *infra,* relating to the quantum of proof necessary to rebut the presumption under the previous version of the statute.

tation on the type of evidence a 3rd party can offer, and allow all relevant testimony on the issue of paternity to rebut the presumption; for example, an expert could give the results of a blood test, or a paramour could testify about his relationship with the mother." H.Rpt., H.B. 485 (1988) (notes on Delegate Masters's floor amendment).

In addition to the history of the statute, we are persuaded further by the presence of FL § 5–1029(e)(4), allowing blood tests with a high degree of statistical reliability to create their own rebuttable presumption of paternity. We recognize that this statute is not specifically applicable to the legitimacy presumption, and was enacted primarily in response to a federal requirement of matching state legislation in order to maintain federal funding for child support enforcement, and therefore is not overwhelming evidence of legislative intent. *See* Bill File for S.B. 312 (1994). Nonetheless, in our effort to give both statutes full effect, as we are required to do, we conclude that the paternity statutes favor the use of blood test evidence, and would likely favor their use for rebutting the legitimacy presumption. Otherwise, the legislature would have created the potential for dueling rebuttable presumptions of paternity in two different men, with no "trumping" mechanism. We do not believe that the legislature intended such an incongruous result.[16]

---

**16.** We acknowledge the presence of Maryland Rule 5–301, entitled "Presumptions in Civil Actions," and especially note section (b) of the Rule:

**Inconsistent Presumptions.**—If two presumptions arise which conflict with each other, the court shall apply the one that is founded upon weightier considerations of policy and logic. If the underlying considerations are of equal weight, the presumptions shall be disregarded.

Under our view of the instant case, the "potential" for dueling presumptions is never realized because the FL § 5–1028(c) presumption is rebutted by the introduction of evidence relevant to genetic blood testing meeting the basic statutory requirements for admissibility. It is only then that FL § 5–1029(e)(4) could come into play if the blood test results exceed the 99.0% threshold. Accordingly, the two presumptions are not vying to occupy the same space, and since there is no "conflict" between the presumptions, the Rule fortunately does not require us to decide whether the policy and logic considerations behind FL § 5–

Perhaps even more convincing than the legislative history or context of the statute is a comparison of the quantum of proof formerly required to rebut the legitimacy presumption under the statute's pre–1988 formulation with the level of accuracy and reliability that modern blood test evidence provides. In *Corley v. Moore, supra,* the Court of Appeals held that testimony of the mother's sister and mother that she was separated from her husband was sufficient to rebut the presumption. Similarly, in *Shelley v. Smith, supra,* it was determined that the testimony of the mother's brother-in-law that she and her husband were not living together was suitable to rebut the presumption. *Id.,* 249 Md. at 631, 241 A.2d 682. Moreover, in *Downes v. Kidwell, supra,* this Court found that the presumption was rebutted by the testimony of the mother's mother that the mother had ceased living with her husband at the alleged time of conception. *Id.,* 14 Md.App. at 96, 286 A.2d 199. On balance, the recurring theme of these cases is that the presumption was typically able to be rebutted merely by a relative of the mother testifying that the married couple were not living under the same roof at the approximate time of conception. Although this is all that the statute required, it is not overwhelming, let alone conclusive, factual proof that the husband was not the father. In practical terms, not sharing the same residence and not having sexual intercourse are, realistically speaking, not the same determination.

On the other hand, Human Leukocyte Antigens testing and DNA Typing tests generally result in high statistical probabilities whether paternity does or does not lie with the husband.[17]

---

1029(e)(4), which are presumably to permit scientific advances in genetic testing to streamline the procedures for obtaining child support, are "weightier" than those supporting FL § 5–1028(c), which owes its origin to the so-called Lord Mansfield's Rule, *see Staley, supra,* 25 Md.App. at 103, first announced in 1777 in the case of *Goodrich v. Moss,* 98 Eng.Rep. 1258, where it was said that "[i]t is a rule founded in decency, morality and policy, that the father or mother shall not be permitted to say, after marriage, that their offspring is spurious." *See, e.g., Hale v. State,* 175 Md. 319, 323, 2 A.2d 17 (1938).

**17.** The scientific information described in this paragraph is derived from both the testimony of Mr. Chiafari and data submitted to the State

There are essentially three statistical expressions of paternity that laboratories generally use. The first is the power of exclusion. Mr. Chiafari's testimony in this case indicated that the genetic markers would exclude 99.96% of the men falsely accused of paternity in this case. The second expression is known as a paternity index, which is a ratio that indicates how many times more likely that the alleged father is to be the biological father than a man in the unrelated random population of similar ethnic background. In this case, the paternity index was 1,013 to 1 (i.e., appellant is over 1,000 times more likely to be Alexandria's father than any other man sharing his ethnic background), according to Mr. Chiafari's testimony. The third statistical expression is known as the probability of paternity, which is a statistical formula, based on Bayes Equation, that tests the hypothesis that the accused father is the biological father. In computing this figure, both genetic and social evidence is employed. The stronger the genetic evidence in any given case, the less value the social evidence has on the probability of paternity. In the instant case, the probability of appellant's paternity was determined to be 99.9%. It is our view that such scientific data generally, and especially in this case, is at least as reliable as testimony from one of appellee's relatives or friends that she lived separate and apart from her husband. In fact, the scientific data is almost certainly significantly more reliable.

Accordingly, we conclude that the trial judge in this case properly allowed the blood test results and the related testimony of Mr. Chiafari to rebut the presumption contained in FL § 5–1028(c)(1).[18] Once the court was satisfied that the

Senate by the Senior Director of Paternity Testing at Genetic Design, Inc., which is contained in the Bill File for S.B. 312 (1994). *See also* *Tandra S. v. Tyrone W.*, 336 Md. 303, 327, 648 A.2d 439 (1994) (Eldridge, J., dissenting) (briefly reviewing the advances in the scientific processes for determining fatherhood and citing a number of related treatises).

**18.** Because appellee in this case offered the blood tests report *and* presented the testimony of the laboratory expert, Mr. Chiafari, we need

presumption had been rebutted, FL § 5–1028(c)(3) became applicable, and it was no longer necessary for appellee to establish nonaccess of the husband to rebut the presumption. Nevertheless, the presumption having found to be rebutted and although the testimony was not necessary, appellee herself became competent to testify as to the husband's nonaccess. *See* FL § 5–1028(c)(4). She did so in this case by indicating that she was living separate and apart from her husband during the period of conception. Therefore, at the very least, a legally sufficient jury question as to appellant's paternity was presented, and the trial court did not err in denying appellant's motion for judgment on the basis that the presumption of legitimacy had not been overcome.

## III.

Appellant argues that the circuit court erred by refusing to give his requested jury instructions regarding: (1) the requirement of court "selection" of the laboratory that did the blood testing; and (2) his version of how the legitimacy presumption may be rebutted. Maryland Rule 2–520(c) provides that a court "need not grant a requested instruction if the matter is fairly covered by instructions actually given." When reviewing the propriety of denying a requested jury instruction, our task is thus to "determine whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given." *Wegad v. Howard Street Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123 (1992).

The applicable legal principles related to admissibility of blood tests and the legitimacy presumption are set forth and discussed in sections I. and II., *supra.* Our review of the record indicates that the instructions actually given by the

not resolve the question of whether a blood test, in and of itself, may rebut the legitimacy presumption in the instant case.

trial judge in this case were correct statements of the law,[19] all of the instructions having to do with the contended issues were applicable, and the substance of appellant's requested instructions were nothing more than his own view of what the law should be, or once was, not what it actually is. We see no error in the circuit court's denial of these proposed instructions.

## IV.

Finally, appellant maintains that the trial court erred in proceeding to conduct a child support hearing immediately following the jury verdict establishing his paternity because he was denied the reasonable notice to which FL § 5–1037 entitled him. Specifically, he alleges that the only notice he received relating to the January, 1995 proceedings was from the circuit court's assignment office, which indicated only that a jury trial on the issue of paternity would be held. As indicated, appellee filed the instant complaint on 30 September 1992, seeking establishment of paternity in appellant, *an order for child support*, and medical coverage for Alexandria. Appellant answered the complaint on 20 November 1992, alleging that he was not the child's father, and that there was *no basis for a claim against him for child support* and medical coverage. The paternity trial and subsequent child support hearing were held over two years after appellant answered the complaint. Based upon the facts of this case, especially considering the length of time between the complaint and the hearing and the ongoing need for support of Alexandria, we conclude that appellant was provided with "reasonable notice" under FL § 5–1037. In addition, other statutory provisions support the view that paternity and child support determinations were intended to be made in a single hearing. For example, FL § 5–1032 states, in pertinent part:

---

19. In fact, with respect to the admissibility of blood tests, the trial court essentially read directly from the applicable statute, FL § 5–1029(e).

(a) If the court or jury, as appropriate, finds that the alleged father is the father, the court shall pass an order that:

(1) declares the alleged father to be the father of the child; and

(2) provides for the support of the child.

(Emphasis supplied). Similarly, support is found also in FL § 5–1033(a), which provides that "[i]n a paternity proceeding, the court may order the father . . . to pay all or part of . . . the support of the child." (Emphasis supplied).

Even if the notice [20] from the assignment office could be said to somehow excuse appellant from preparing for trial under the expectation that a child support hearing would take place at a subsequent date after an unfavorable (to him) result in the paternity trial, appellant has utterly failed to demonstrate in any way how he was prejudiced. The calculation of the child support order in this case adhered to the Child Support Guidelines after the predicate facts were adduced. A full hearing covering such matters took place in this case. Appellant did not even cross-examine appellee, which he could have done without waiving his right of appeal. Without a proper showing of how he was harmed by this alleged error, we shall not reverse the judgment of the circuit court. *Harris v. Harris, supra.*

---

**20.** As indicated above, appellant states in his brief that "the only notice [he] received was from the Clerk's office pertaining to the jury trial on the issue of paternity." With respect to the scheduling notice of the 17 January 1995 jury trial, the record extract contains only a letter dated 12 October 1994 from the Assistant State's Attorney's Office to the circuit court's assignment office, which requested that a "paternity jury trial" be scheduled for 17 January 1995. The letter indicated further that a copy of the letter was sent to appellant's counsel. When questioned at oral argument, appellant's counsel indicated that although not included in the record extract, a copy of the actual notice from the assignment office was a part of the record. After a careful examination of the record, we could find no evidence of such a notice sent from the assignment office or the clerk's office, but we may assume that such notice was sent, including similar language from the 12 October 1994 letter from the Assistant State's Attorney's Office, i.e., "paternity jury trial."

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.