45 A.3d 243

Amy MULLIGAN

v.

William CORBETT.

No. 43, Sept. Term, 2011.

Court of Appeals of Maryland.

May 23, 2012.

Laura N. Venezia (Conklyn & Associates of Frederick, MD), on brief, for petitioner.

Keith N. Schiszik (Day & Schiszik, Frederick, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, LAWRENCE F. RODOWSKY (Retired, specially assigned) and IRMA S. RAKER (Retired, specially assigned), JJ.

LAWRENCE F. RODOWSKY (Retired, specially assigned), J.

This case calls upon us to delve once again into the issue of genetic testing to determine paternity. In particular we are asked to determine whether a man who claims to be the father of a child conceived while the mother was married to another man, but born after the mother and her husband divorced, has an unconditional right to genetic testing to determine whether he is the biological father. The question requires us to identify which of two statutory schemes dictates the outcome.

The Paternity Proceedings subtitle ("Paternity subtitle"), codified at Maryland Code (1999, 2006 Repl.Vol., 2010 Cum. Supp.), §§ 5–1001 through 5–1048 of the Family Law Article (FL), presumes that the mother's husband at the time of conception is the father of that child, see FL § 5–1027(c)(1). Section 5–1029(b) requires a court to order blood testing "to determine whether the alleged father can be excluded as being the father of the child."[1] See Langston v. Riffe, 359 Md. 396, 424, 754 A.2d 389, 404 (2000). Alternatively, Maryland Code (2001, 2011 Repl.Vol.), § 1–206(a) of the Estates and Trusts Article (ET), presumes that a child born or conceived during the mother and her husband's marriage is the legitimate child of each spouse. A request for blood testing to rebut that presumption is analyzed as a motion pursuant to Maryland Rule 2–423 ("Mental or physical examination of persons") and invokes the trial court's discretion in deciding whether ordering such testing would be in the best interests of the child.

---

1. We shall use the terms "blood testing," "genetic testing," and "paternity testing" interchangeably.

*Turner v. Whisted,* 327 Md. 106, 113–14, 607 A.2d 935, 939 (1992). For the reasons that follow we hold that, under the facts of this case, the circuit court did not err or abuse its discretion by considering the best interests of the subject child when rejecting the requested blood testing.

## I

In order to put into proper context the underlying facts and procedural history of this case, it is helpful first to review generally the two statutory schemes at issue. We begin with the Paternity subtitle of the Family Law Article.

Until 1963, the subject now addressed in the Paternity subtitle was covered under the heading of "Bastardy" or "Bastardy and Fornication." *Eagan v. Ayd,* 313 Md. 265, 268, 545 A.2d 55, 56 (1988). Those laws served "to prevent the county from having to bear the full cost of supporting an illegitimate child . . . [and] to punish fornication, and the laws were deemed criminal in nature." *Id.* at 269, 545 A.2d at 56. The criminal bastardy laws were in effect when, in 1941, the General Assembly enacted former Article 12, § 17 of the Code. *Id.* That section was added "to give the court the benefit of a relatively new scientific tool—the use of blood tests to *prove nonpaternity.*" *Id.,* 545 A.2d at 56–57 (emphasis added). The provision was "patently for the benefit of the defendant," *i.e.,* a man alleged by the State to be the child's father. *Id.* at 270, 545 A.2d at 57. Under that provision, " '[w]henever the defendant in bastardy proceedings denies that he is the father,' " then, " '*upon petition of the defendant,* the court shall order that the complainant, her child and the defendant submit' " to blood testing. *Id.* (quoting former Article 12, § 17 of the Maryland Code) (emphasis in original).

The law underwent major change in 1963, when the General Assembly repealed the Bastardy and Fornication Article (former Article 12) "for the purpose of 'entirely revising the laws of this State concerning bastardy and fornication and paternity proceedings; vesting in the several equity courts of this State jurisdiction to hear and determine all such paternity

proceedings; [and] providing generally for such jurisdiction and the procedure for its exercise . . . . ' " *Id.* at 271, 545 A.2d at 57 (quoting 1963 Md. Laws, ch. 722) (alteration in original). Pursuant to this revision, "criminal 'Bastardy' became civil 'Paternity.' " [2] *Id.*

The goals of the 1963 enactments were reflected in the report (hereafter "Commission Report") of the Commission to Study Problems of Illegitimacy among the Recipients of Public Welfare Monies in the Program for Aid to Dependent Children (hereafter "Commission"). *Id.* at 272, 545 A.2d at 58. The Commission "concerned itself with bettering the plight of the illegitimate child," and its "recommendations were made 'with the hope that if adopted, illegitimacy will be curtailed and amelioration of the effects of illegitimacy on children and the community at large will result.' " *Id.* (quoting the Commission Report at 22). The legislative declaration to the enactment, codified in former Article 16, § 66A, announced the State's "duty to ameliorate the deprived social and economic status of children born out of wedlock." The declaration expressed three specific purposes for the legislation: (1) promoting the general welfare and best interests of children born out of wedlock; (2) imposing the obligations of parenthood on both parents; and (3) simplifying procedures. The legislative policy expressed in the current Paternity subtitle, nearly identical to the original declaration, is found in FL § 5–1002. The current section provides, in pertinent part:

"(a) *In general.*—The General Assembly finds that:

"(1) this State has a duty to improve the deprived social and economic status of children born out of wedlock; and

"(2) the policies and procedures in this subtitle are socially necessary and desirable.

"(b) *Purpose.*—The purpose of this subtitle is:

---

**2.** The 1963 legislative overhaul nevertheless "carried forward many of the substantive provisions of old Article 12" and left intact the State's Attorney's investigative and enforcement authority. *Eagan v. Ayd,* 313 Md. 265, 271, 545 A.2d 55, 57 (1988).

"(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

"(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

"(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock."

In 1976, the General Assembly again amended the "Paternity Proceedings" subtitle of Article 16 to "enhance effective recovery of child support payments" and "creat[e] . . . the Division of Child Support Enforcement." *Eagan*, 313 Md. at 272, 545 A.2d at 58. In 1982, the Paternity subtitle was further amended, in apparent response to technological advancements in blood testing. *See* Ch. 784 of the Acts of 1982. Previously, the putative father, by motion, could require the court to order, or the court, on its own motion, could order blood tests to determine exclusion from paternity. The 1982 amendment changed "putative father" to "a party to the proceedings." Further, the results were admissible in evidence, not only if they excluded the alleged father, but also if they reflected at least a 97.3% probability of the alleged father's paternity. *Id.* A subsequent amendment in 1984 "eliminate[d] the court's discretion to reject a qualifying blood test." *Id.*

In 1984, the Paternity subtitle of Article 16 "was transferred to the Family Law Article . . . without substantive change," *id.* at 274 n. 5, 545 A.2d at 58 n. 5, and codified at subtitle 10 ("Paternity Proceedings") of Title 5 ("Children"). Subsequent amendments pertinent to the issue presented in this case were enacted in 1995 and 1997.

The 1995 amendment was the General Assembly's response to a decision from this Court holding that a paternity judgment could only be set aside on the basis of " 'fraud, mistake, . . . irregularity,' or clerical error." *Evans v. Wilson*, 382 Md.

614, 630, 856 A.2d 679, 688–89 (2004) (quoting *Tandra S. v. Tyrone W.*, 336 Md. 303, 315, 648 A.2d 439, 445 (1994)). The amendment "provide[d] an alternative way for an adjudged father to challenge a judgment of paternity," by "permit[ting] a paternity judgment to be set aside at any time if blood or genetic testing establishes that the named father is not the biological father of the child." *Id.* at 630–31, 856 A.2d at 689. *See* FL § 5–1038.

The 1997 amendment, in turn, was the General Assembly's response to the "Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the 'Federal Act')," which, "in an attempt to combat the increase in 'out-of wedlock pregnancies,' conditioned the receipt of continued federal assistance on certain federal standards." *Evans*, 382 Md. at 634 n. 6, 856 A.2d at 691 n. 6 (citing *Stubbs v. Colandrea*, 154 Md.App. 673, 684, 686, 841 A.2d 361, 367–68 (2004)). The Federal Act required genetic testing in "certain contested cases" and required that states afford "[p]utative fathers . . . a reasonable opportunity to initiate a paternity action" to establish paternity. *Id.* (citing *Stubbs*, 154 Md.App. at 687, 841 A.2d at 369). Maryland responded by adding subsection (c) to § 5–1002 of the Paternity subtitle of the Family Law Article. Section 5–1002(c) states: "Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child."

The current Paternity subtitle outlines the procedures "through which the state can establish paternity, and thus hold alleged fathers responsible for parental duties, such as child support. It is also the statute that allows alleged fathers to deny paternity." *In re Roberto d.B.*, 399 Md. 267, 275, 923 A.2d 115, 120 (2007). Generally, a complaint must be initiated before the child's eighteenth birthday, FL § 5–1006, and must be accompanied by the consent of the State's Attorney. FL § 5–1010(e). "At the trial, the burden is on the complainant to establish by a preponderance of the evidence that the alleged father is the father of the child." FL § 5–1027(a).

The Paternity subtitle creates a "rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception." FL § 5–1027(c)(1). Upon motion of any party to the complaint, "the court shall order the mother, child, and alleged father to submit to blood or genetic tests" to determine whether the alleged father can be excluded as being the father of the child. FL § 5–1029(a) and (b).[3] If the laboratory report, however, establishes a statistical probability of the alleged father's paternity of at least 99.0%, it may be received into evidence and constitutes a rebuttable presumption of his paternity. FL § 5–1029(f)(4). Then, "[i]f the court finds that the alleged father is the father, the court shall pass an order" so declaring and providing for support. FL § 5–1032(a). The trial court may also "include a provision, directed to any party, regarding: (1) custody of the child; (2) visitation privileges with the child; (3) giving bond; or (4) any other matter that is related to the general welfare and best interests of the child." FL § 5–1035(a).

The Estates and Trusts Article provides independent authority by which the court may make a paternity determination. The express purpose of the Estates and Trusts Article is "to simplify the administration of estates, to reduce the expenses of administration, to clarify the law governing estates of decedents, and to eliminate any provisions of prior law which are archaic." ET § 1–105(a). That same section further provides: "This article shall be liberally construed and

---

3. FL § 5–1029, "Blood or genetic tests," provides:
    "(a) *Requests and orders or tests.*—(1) The [Child Support Enforcement] Administration may request the mother, child, and alleged father to submit to blood or genetic tests.
    "(2) If the mother, child, or alleged father fails to comply with the request of the Administration, the Administration may apply to the circuit court for an order that directs the individual to submit to the tests.
    "(b) *In general.*—On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child."

applied to promote its underlying purpose." Giving the statute the required liberal construction, we years ago held that the Estates and Trusts Article "is not limited in its scope and application to matters of inheritance only." *Thomas v. Solis,* 263 Md. 536, 542, 283 A.2d 777, 780 (1971) (citing *Dawson v. Eversberg,* 257 Md. 308, 262 A.2d 729 (1970), and *Holloway v. Safe Deposit & Trust Co.,* 151 Md. 321, 134 A. 497 (1926)).

Pertinent here, we have interpreted ET §§ 1–206(a) and 1–208 as providing the framework through which the court, in equity, may adjudicate paternity. *Thomas,* 263 Md. at 544, 283 A.2d at 781. Section 1–206(a) provides that "[a] child born or conceived during a marriage is presumed to be the legitimate child of both spouses." "A child born to parents who have not participated in a marriage ceremony with each other," ET § 1–208(a), is considered the child of the mother. ET § 1–208(b) delineates four methods by which to establish the father-child relationship recognized by law: (1) a judicial determination under the "statutes relating to paternity proceedings"; (2) if the father acknowledges himself as the father, in writing; (3) if the father has "openly and notoriously recognized the child to be his child"; or (4) if the father "has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father."

We have held that, where a self-proclaimed biological father sued a mother and her estranged husband, seeking visitation with a child born, but not conceived, during the marriage of the mother and her husband, the complainant, as a party, may request blood testing to rebut the presumptions established by ET § 1–206(a). *Turner,* 327 Md. at 113, 607 A.2d at 938–39. Establishing paternity under the Estates and Trusts Article, as an alternative to the Paternity subtitle is " 'more appropriate[ ]' " and " 'less traumatic.' " *Id.* Such a request is to be analyzed as a motion for mental or physical examination under the command of Rule 2–423. *Id.* That Rule requires a showing of "good cause" before the court will order an examination. *Id.* at 114, 607 A.2d at 939. We interpreted the "good cause" standard, in the context of paternity proceedings pursuant to the Estates and Trusts Article, to require a judicial determi-

nation of "competing interests," including if blood testing is in the best interests of the child. *Id.* at 116, 607 A.2d at 940.

There is an interrelationship between the Estates and Trusts Article and the Paternity subtitle. FL § 5–1005(a), entitled "Legitimation proceedings," provides that "[a]n equity court may determine the legitimacy of a child pursuant to § 1–208 of the Estates and Trusts Article." FL § 5–1005 "does not limit paternity proceedings under [the Paternity] subtitle except after the legitimation of a child under this section." FL § 5–1005(b). The Estates and Trusts Article also includes a reciprocal reference to the Paternity subtitle, as ET § 1–208(b) specifies, as one method of legitimation, that "a child born out of wedlock shall be considered the child of his father . . . if the father '[h]as been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings.' " *Taxiera v. Malkus,* 320 Md. 471, 478–79, 578 A.2d 761, 764 (1990) (quoting ET § 1–208(b)(1)) (alteration in original).

It is with this background in mind that we turn to the case before us.

## II

Petitioner, Amy Mulligan, is the mother of Gracelyn Mulligan, born January 23, 2010. Respondent, William Corbett, strongly suspecting that he is the father of Gracelyn, initiated the case by filing in the Circuit Court for Frederick County a Complaint for Paternity, Child Support and Visitation Schedule. The present appeal stems from the circuit court's order denying Respondent's request for paternity testing and ordering that Petitioner's former husband, Thomas Mulligan (hereafter Mr. Mulligan), who is not a party to this case, "is the legal father" of Gracelyn. The underlying facts, essentially undisputed, were developed at a hearing on Respondent's request for testing.

Petitioner and Mr. Mulligan were married on March 26, 1999. Three children were born during their marriage, none of whom is Gracelyn. Difficulties arose several years into the

marriage, and Petitioner and Mr. Mulligan agreed to separate. They participated in mediation and ultimately reached an agreement providing for, *inter alia,* their separation and the custody and support of their children. The agreement, dated April 20, 2009, recognized that the couple "mutually and voluntarily agreed to cease living together and have in fact lived separate and apart without cohabitation since [April 4, 2008]." Despite these representations, Mr. Mulligan testified at the hearing that he and Petitioner resided together in the family home with their three children during March and April 2009 and had sexual relations during those months. Nevertheless, Petitioner ultimately filed a complaint for divorce on May 6, 2009, in which she affirmed under penalty of perjury that she and Mr. Mulligan had been separated since April 4, 2008.

In late March 2009, Petitioner and Respondent, who had known one another from their youth, reacquainted, started dating, and developed a sexual relationship. According to Respondent, the couple "met as frequently as [their] schedules would allow," they had discussed their mutual desire, and were attempting to conceive a child. The following month (April), the couple made concerted efforts to time their relations with Petitioner's menstrual cycle. About a month after that meeting, Petitioner, who, by then had moved out of the family home and into her own apartment, informed Respondent that she was pregnant.

In August 2009, Petitioner moved with her three children to live with Respondent in Pennsylvania. Petitioner and Respondent's joint living arrangement was short-lived. About one month after Petitioner's move, Respondent demanded that she and her children vacate the home. Petitioner and her children moved out during the first half of September 2009, and, sometime during the same month, returned to live with Mr. Mulligan. On September 25, 2009, after Petitioner had testified before a hearing examiner that she and Mr. Mulligan had lived separate and apart, without sexual relations, since April

4, 2008, the circuit court signed a Judgment of Absolute Divorce incorporating the couple's separation agreement.[4]

Gracelyn was born on January 23, 2010. Mr. Mulligan testified that, at his urging, Petitioner contacted Respondent to inform him of the birth, because "[Respondent] has a right." Petitioner called Respondent on the evening of Gracelyn's birth, and he visited her and the baby the following day. During the visit, Petitioner asked Respondent to sign the affidavit of parentage [5] for Gracelyn's birth certificate. When

---

**4.** When Petitioner was questioned during the May 2010 hearing in the instant matter about the inconsistency between her sworn testimony during the divorce proceedings that she had been separated uninterruptedly since April 2008 and the assertion that Mr. Mulligan might be Gracelyn's biological father, Petitioner exercised her Fifth Amendment rights.

**5.** The import of an "affidavit of parentage" is delineated in FL § 5–1028. That section provides:

"(a) *In general.*—An unmarried father and mother shall be provided an opportunity to execute an affidavit of parentage in the manner provided under § 4–208 of the Health–General Article.

. . . .

"(c) *Requirements for completion.*—(1) The completed affidavit of parentage form shall contain:

"(i) in ten point boldface type a statement that the affidavit is a legal document and constitutes a legal finding of paternity;

"(ii) the full name and place and date of birth of the child;

"(iii) the full name of the attesting father of the child;

"(iv) the full name of the attesting mother of the child;

"(v) the signatures of the father and the mother of the child attesting, under penalty of perjury, that the information provided on the affidavit is true and correct;

"(vi) a statement by the mother consenting to the assertion of paternity and acknowledging that her cosignatory is the only possible father;

"(vii) a statement by the father that he is the natural father of the child; and

"(viii) the Social Security numbers provided by each of the parents.

. . . .

"(d) *Execution constitutes legal finding of paternity.*—(1) An executed affidavit of parentage constitutes a legal finding of paternity, subject to the right of any signatory to rescind the affidavit:

"(i) in writing within 60 days after execution of the affidavit; or

"(ii) in a judicial proceeding relating to the child:

"1. in which the signatory is a party; and

Petitioner denied Respondent's request "to have paternity tests done," Respondent refused to sign because, he later testified, he was upset that he "wasn't being treated as the father" and "needed to be 100 percent sure" that he was the father. After a further angry exchange, Respondent left the hospital, and, according to Petitioner, "that was the last that we heard from him or saw him or had any contact with him." Soon thereafter, Mr. Mulligan informed Petitioner that he "would love to be the baby's father. The baby needs insurance. Baby needs to be taken care of and put my name down." Mr. Mulligan did not testify explicitly that he signed the affidavit of parentage and no such affidavit was entered into evidence.[6] Since September 2009, when Petitioner returned to the family home, Mr. Mulligan has taken on the role of Gracelyn's father.

In a letter dated February 3, 2010, Respondent, through counsel, informed Petitioner that he wished to have "legally recognized" that he is Gracelyn's biological father and to "attain some of the rights, privileges and obligations of parenthood." Respondent therefore desired "genetic DNA testing be undertaken to demonstrate ... Gracelyn's lineage." The letter explained that, "[a]ssuming the child to be [Respondent's], I would then like to enter into negotiations to establish a regular access schedule for my client with his daughter, and to similarly, establish appropriate child support under the Maryland Child Support Guidelines." Petitioner did not respond to Respondent's entreaties.

---

"2. that occurs before the expiration of the 60-day period."

**6.** Gracelyn's birth certificate also was not entered into evidence. Petitioner, however, included a copy of the birth certificate in her reply brief. The certificate indicates that Gracelyn's father is "Thomas Gerard Mulligan, Jr." Respondent has not moved to strike the birth certificate, as not properly part of the record on appeal, which indeed it is not. *See Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 500 n. 1, 16 A.3d 159, 161 n. 1 (2011); *see also* Md. Rule 8–413. We shall not consider the birth certificate, or, for that matter, the affidavit of Mr. Mulligan, appended to Petitioner's brief, that he and Petitioner remarried on July 21, 2011.

On February 25, 2010, Respondent filed a Complaint for Paternity, Child Support and Visitation Schedule in the Circuit Court for Frederick County. Respondent's Complaint does not cite either the Estates and Trusts Article or the Paternity subtitle as the basis of his paternity action, but the complaint was marked as "approved for filing" by an Assistant State's Attorney, presumably to comply with the Paternity subtitle's requirement that the State's Attorney consent to proceedings under that subtitle. *See* FL § 5–1010(e). Respondent alleged that it was in Gracelyn's best interests "to know for certain who her father is." He further alleged that "it would be in the best interests of the child to allow her to develop a relationship with her actual father, the Plaintiff." Respondent requested that the circuit court determine "whether or not DNA testing should be [o]rdered," "establish a visitation schedule," and "determine the appropriate amount of child support to be paid, commencing at the time that the visitation schedule begins."

Petitioner responded with a Motion to Dismiss for Failure to State a Claim. As grounds for the motion, Petitioner asserted that Gracelyn was "the legal child of Thomas Mulligan" and "no showing of good cause of sufficient persuasive force to overcome the statutory presumption [of legitimacy in ET § 1–206(a) ] ha[d] been made and thus [the circuit court] should not require a blood test to determine 'paternity' of a child living with her legal father in a stable home environment." Respondent, in opposing dismissal, highlighted, among other points, that Gracelyn was conceived well after the Mulligans separated and last had sexual relations (as Petitioner had attested in her divorce action), and the child was born after their divorce. Consequently, the Family Law Article's Paternity subtitle, applicable *"to resolve disputes regarding paternity of children who are born out-of-wedlock"* (*i.e.*, FL § 5–1002) is the appropriate statutory scheme by which to determine Gracelyn's paternity.

The circuit court denied Petitioner's Motion to Dismiss and set for a hearing the issue of whether to order blood testing. At the time of the hearing on May 13, 2010, Gracelyn was

almost four months old. Petitioner, Respondent, Mr. Mulligan, and Petitioner's father testified. The testimony included all that we have summarized. In addition, Mr. Mulligan testified that he was Gracelyn's legal father, though he acknowledged he might not be so biologically. He testified further that he had undergone a vasectomy in 2005 and that there had been no "other pregnancies since [his] vasectomy." On cross-examination, Petitioner agreed that "the odds were pretty good this man [Respondent] was the father of [her] daughter." She further testified that Mr. Mulligan "is the legal father of the child."

The circuit court announced its ruling on the record, concluding that the Estates and Trusts Article, not the Paternity subtitle, was the appropriate statute by which to determine Gracelyn's paternity. The court, evidently relying on two cases from this Court, *Kamp v. Department of Human Servs.,* 410 Md. 645, 980 A.2d 448 (2009), and *Monroe v. Monroe,* 329 Md. 758, 621 A.2d 898 (1993), reasoned that the Paternity subtitle only applied when paternity was, in the court's words, "void," and, in this matter, paternity was not void because Mr. Mulligan was Gracelyn's presumed father under the Estates and Trusts Article. The court, applying the best interest standard employed in *Monroe* and *Kamp,* concluded that it was not in Gracelyn's best interests to order blood testing. The trial court found, *inter alia:* "[T]his child has been in an intact family, has been in a family that this Court is satisfied provides her with stability"; and Gracelyn was "well cared for, well loved, well nourished, . . . not just . . . in a physical sense but in . . . an emotional sense." The court noted, among other things, that Petitioner's relationship with Respondent "was very limited"; and Respondent had forced Petitioner out of the home they had shared in the early fall of 2009, when she was pregnant. The circuit court thereafter entered a written order dated May 26, 2010, denying Respondent's request for paternity testing and ordering "that Thomas Mulligan is the legal father of the minor child, Gracelyn Mulligan."

Respondent timely appealed to the Court of Special Appeals presenting three issues, only part of the first of which—whether Respondent was entitled to blood testing to determine paternity—the court decided.[7] *Corbett v. Mulligan,* 198 Md.App. 38, 41, 16 A.3d 233, 234 (2011). The court correctly recognized at the outset that Maryland appellate cases "have addressed the choice of statutory provisions on several occasions, primarily in the context of a child born during a marriage." *Id.* at 54, 16 A.3d at 242. The intermediate court further recognized that the legislature specifically provided for a "putative father" to initiate an action under the Paternity subtitle, pursuant to FL § 5–1002(c). The court understood the meaning of " 'putative father' " to be " 'the alleged biological father of a child born out of wedlock.' " *Id.* at 56, 16 A.3d at 243 (quoting *Stubbs,* 154 Md.App. at 688, 841 A.2d at 367). The Court of Special Appeals concluded that, "because Gracelyn was born out of wedlock, the Family Law Article was the proper statutory provision to address [Respondent's] request for genetic testing to determine Gracelyn's paternity." *Id.* at 60, 16 A.3d at 245. Accordingly, the Court of Special Appeals reversed the judgment of the circuit court and remanded the matter to that court for further proceedings. *Id.*

We granted certiorari, 420 Md. 463, 23 A.3d 895 (2011), to consider the following question: "Should the paternity of a child conceived during a marriage but born after divorce be determined under the Estates and Trusts Article or the Family Law Article?"

---

**7.** The three issues Respondent presented to the Court of Special Appeals were: (1)(A) Whether a child conceived during marriage but born after separation was born "out of wedlock" and therefore entitled to blood testing to determine paternity; (B) if testing was not mandatory, whether the trial court erred under the best interests test by not ordering blood testing; (2) whether the trial court erred by considering the affidavit of paternity when it was not introduced into evidence and when it established that the Mulligans had committed perjury; and (3) whether the trial court's denial of Respondent's request for blood testing denied his due process rights to establish parenthood. *Corbett v. Mulligan,* 198 Md.App. 38, 41, 16 A.3d 233, 234 (2011). All that is before us is the first of those questions.

## III

In analyzing the competing statutory schemes at issue, we do not write on a clean slate. *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935, decided in 1992, though not the first case on the subject of paternity,[8] has been the touchstone since then for many of the decisions of this Court and the Court of Special Appeals in the years that followed. We review it at some length.

The petitioner Turner was involved in a sexual relationship with an unmarried woman. *Id.* at 109, 607 A.2d at 936. The woman, Kelly Whisted, became pregnant. *Id.* She married another man, Mr. Whisted, and gave birth to the child five months into the marriage. *Id.* Six months after the birth, Mr. and Mrs. Whisted separated, and Mrs. Whisted renewed her relationship with Turner. *Id.,* 607 A.2d at 937. When that relationship ended eighteen months later, Turner, alleging that he was the biological father of the child, sued for visitation and sought a court-ordered blood test to establish his paternity. *Id.* at 110, 607 A.2d at 937. The circuit court denied the motion and granted summary judgment for the Whisteds. *Id.* The Court of Special Appeals agreed with the denial of the motion for blood testing, *id.* at 110–11, 607 A.2d

8. We allude here to *Thomas v. Solis,* 263 Md. 536, 283 A.2d 777 (1971). At the time we decided that case in 1971, the paternity law did not include the provision it now does, in FL § 5–1002(c), granting putative fathers the right to establish paternity. As we discussed in Part I, the thrust of the paternity statute at the time of *Thomas* was to grant mothers of children born out of wedlock and the Child Support Enforcement Administration the right to establish the paternity of putative fathers for purposes of securing child support. Indeed, we evidently were unsure when we decided *Thomas* whether the paternity statute authorized a putative father to attempt to establish his paternity. We wrote: "We do not find it necessary, in the case at bar, to broaden the application of [former] Article 16, [the then-Paternity statute] ... *were it of legal accomplishment,* so as to provide within its framework a provision for a father to obtain a filiation declaration." *Id.* at 543–44, 283 A.2d at 781 (emphasis added). We held "that a reasonable construction of Article 93, Sec. 1–208 [now, ET § 1–208] achieves that purpose and we think with a more satisfactory and 'less traumatic' effect than a proceeding under Article 16, Sec. 66, *were one available thereunder." Id.* at 544, 283 A.2d at 781 (emphasis added).

at 937, though we held that, on remand, the circuit court was required to consider the child's best interests before ruling on the motion for blood testing. *Id.* at 116–17, 607 A.2d at 940.

We noted preliminarily that Turner had not referenced the Paternity subtitle in his Complaint for Visitation or in his Motion for Blood Test; instead he invoked the equity court's jurisdiction under the Estates and Trusts Article to determine paternity because the State's Attorney had declined to consent to his action under the Paternity subtitle, as required by FL § 5–1010(e). *Id.* at 111, 607 A.2d at 937. We acknowledged that both the Estates and Trusts Article and the Family Law Article provide a course of action by which to establish paternity, as indicated by the "reciprocal references in the two articles." *Id.* at 112, 607 A.2d at 938. And we concluded that Turner "quite properly" invoked the Estates and Trusts Article because he had alleged that the child whose paternity was at issue "was a child 'born to parents who had not participated in a marriage ceremony with each other.'" *Id.* (quoting ET § 1–208). We then held that, when a child is presumed legitimate and "two men each acknowledge paternity of the same child," then "an action to establish paternity is more appropriately brought under the Estates & Trusts Article" because that statutory scheme "presents the 'more satisfactory' and 'less traumatic' means of establishing paternity" when a child is born during a marriage. *Id.* at 113, 607 A.2d at 938 (quoting *Thomas,* 263 Md. at 544, 283 A.2d at 781; *Dawson,* 257 Md. at 314, 262 A.2d at 732). Finally, we recognized that a motion for blood testing under the Estates and Trusts Article was to be analyzed as a request for physical examination under Maryland Rule 2–423. *Id.,* 607 A.2d at 939. We concluded that the existence of the presumption of legitimacy under the Estates and Trusts Article was not an absolute bar to Turner's claim and, therefore, the circuit court, on remand, was to consider the child's best interests before deciding whether to order blood testing. *Id.* at 117, 607 A.2d at 940.

One year later, in *Monroe v. Monroe,* 329 Md. 758, 621 A.2d 898 (1993), we applied the reasoning of *Turner* to hold that a mother, who was unmarried throughout the period from con-

ception to birth, was not entitled to *disestablish* paternity of her child whom we described as "born out of wedlock." *Id.* at 760, 621 A.2d at 899.[9] Preliminarily, we recognized that the matter did not arise as a paternity establishment case, but rather "in the context of a child custody dispute between the mother of a child born out of wedlock and the man who has, both before and after their marriage, acknowledged that child as his own and maintained a fatherly relationship with her." *Id.* at 766, 621 A.2d at 902. We also noted that Ms. Monroe "quite candidly acknowledge[d] that, if successful, she [would] seek no support from the biological father, nor [would] she attempt to foster a relationship between him and the child." *Id.* We reasoned that neither the Estates and Trusts Article nor the Paternity subtitle was "directly implicated" in the case because "establishing paternity is not a necessary factor to be considered when addressing the issue of custody." *Id.* at 767, 621 A.2d at 902. We nevertheless looked to the policies undergirding those two statutory schemes because they were "relevant to the determination whether good cause for ordering the blood tests has been shown," as Ms. Monroe's motion for blood testing evidently was analyzed as a request pursuant to Maryland Rule 2–423. *Id.*

We then recognized that both Articles "are aimed at the legitimation of children born out of wedlock," *id.* at 767, 621 A.2d at 902, and noted further that "[t]he purpose of legitima-

---

9. In *Monroe*, 329 Md. 758, 621 A.2d 898 (1993), the mother, Ms. Monroe, conceived the child after she had been dating Mr. Monroe for a short period of time. *Id.* at 760, 621 A.2d at 899. Mr. Monroe was present when the child was born and had his name placed on the birth certificate, and the Monroes lived together, with the baby, for the next two-and-a-half years before they married. *Id.* at 760–61, 621 A.2d at 899.

When the Monroes ultimately parted, within the separation and custody proceedings, Ms. Monroe sought blood testing to prove that Mr. Monroe was not the child's biological father. *Id.* at 762, 621 A.2d at 900. The circuit court granted the request and the results excluded Mr. Monroe as the father. *Id.* The circuit court then admitted those results into evidence, found that neither party was unfit, "found 'as a matter of law,' that exceptional circumstances did not exist," and ordered that Ms. Monroe be granted temporary custody of the child. *Id.* at 762–63, 621 A.2d at 900.

tion statutes is well served, and, in fact, furthered when, without court proceedings, a child born out of wedlock is legitimated." *Id.* at 768, 621 A.2d at 902. We reasoned that "[i]t matters not whether [legitimation] was accomplished pursuant to [ET] § 1–208(b)(2), (3), and (4) or pursuant to [FL] § 5–1029" because, "where the party against whom the paternity decree is sought ... admits paternity, no further judicial proceedings to establish that fact are required." *Id.*, 621 A.2d at 902–03 (citations omitted). We recognized that Mr. Monroe had acted as the child's father and provided for her since her birth. *Id.* at 769–70, 621 A.2d at 903–04. We reasoned that "[t]he best interest of a child born out of wedlock but subsequently treated as if it were the legitimate issue of the man who married its mother is not necessarily served by establishing that that man is not the biological father, without a concomitant establishment of paternity in someone else." *Id.* at 771, 621 A.2d at 904. Therefore, we concluded that the trial court erred in not considering whether the blood testing would be in the child's best interests, given the mother's motivations. *Id.* at 773, 621 A.2d at 905.

One year after we decided *Monroe,* we considered another custody case, *Sider v. Sider,* 334 Md. 512, 516, 639 A.2d 1076, 1078 (1994), in which the mother, Ms. Sider, and the biological father (not Mr. Sider) jointly petitioned to establish paternity. Ms. Sider simultaneously and independently sought custody— in the context of the divorce proceedings Mr. Sider initiated— of the child born during the Siders' marriage, less than two years before the divorce action. *Id.* at 515–17, 639 A.2d at 1077–78. Ms. Sider and the biological father had confirmed the child's paternity through consensual, extrajudicial genetic testing. *Id.* at 516, 639 A.2d at 1078. The circuit court consolidated the two matters and, after that court ruled that paternity was evidently not at issue given the extrajudicial paternity test, Ms. Sider withdrew her motion for court-ordered blood testing. *Id.* at 517, 639 A.2d at 1079. The circuit court ultimately "ordered that [Mr. Sider] be 'recognized as the natural father of [the child]' and denied the

Petition for Paternity filed by [Ms. Sider] and [the biological father]." *Id.* at 520, 639 A.2d at 1080.

Based on our then-recent decision in *Monroe*, we noted that, although generally we need not establish paternity before awarding custody, the scenario presented was "unique" and required such a determination. *Id.* at 525–26, 639 A.2d at 1083. We further noted that, because "[t]he underlying facts in this case conclusively establish that [the alleged biological father] is [the child's] biological father . . . it appears that no further proceedings with regard to paternity were necessary." *Id.* at 526, 639 A.2d at 1083 (footnote omitted). We then turned to the question of "whether the trial court had the authority to deny the paternity petition jointly filed by [the child's] biological mother, and [the child's] biological father, when there was no marital integrity to protect." *Id.* In deciding that question, we relied on *Turner* for the proposition that "a trial court must consider the best interests of a child before granting a putative father's request for a blood test" and held that the trial court should have considered the child's best interests before deciding the paternity petition, *id.* at 527, 639 A.2d at 1083, even though the parties did not dispute the biological paternity of the child. We ultimately concluded that, had the circuit court conducted the required best interest analysis, it would have granted the petition because of the various interests involved, including the child's best interest, the biological father's interest, and the lack of family integrity to protect. *Id.* at 528–29, 639 A.2d at 1084.

The cases we have discussed so far preceded the General Assembly's amendments to the Paternity subtitle in 1995 and 1997, which we discussed earlier, and our 2000 decision in *Langston v. Riffe, supra*, about which we say more later. We analyzed those subsequent occurrences in *Evans*, 382 Md. 614, 856 A.2d 679.

Evans "claimed to be the biological father of [the child], who was conceived and born while [the mother] was married to another man." *Id.* at 617, 856 A.2d at 681. Evans sought mandatory blood testing under the Paternity subtitle. *Id.* at

621, 856 A.2d at 683. The other man was "the only man [the child had] known as a father. She call[ed] him 'Daddy,' and he participate[d] in many of the routine tasks involved in parenting, such as caring for [the child] when she [was] sick and helping pay for her daycare, food, and clothes." *Id.* at 620, 856 A.2d at 683.

Evans claimed that the legal landscape had changed in the years since we decided *Turner.* *Id.* at 629, 856 A.2d at 688. We agreed that the landscape indeed had changed, but the changes, though significant, "do not apply to individuals in his position." *Id.* We said: "It is true that since the *Turner* decision, the General Assembly and this Court have changed the legal landscape of 'Paternity Proceedings' governed by the Family Law Article." *Id.* at 630, 856 A.2d at 688. We noted that the 1995 amendment to FL § 5–1038 served "to provide an alternative way for an adjudged father to challenge a judgment of paternity," by "permit[ting] a paternity judgment to be set aside at any time if blood or genetic testing establishes that the named father is not the biological father of the child." *Id.* at 630–31, 856 A.2d at 689.

We noted too that our later decision in *Langston* held that the 1995 amendment applied retroactively to permit "men who had been declared fathers by the court before that date[,] . . . pursuant to Section 5–1029, to reopen paternity proceedings for blood or genetic testing." *Id.* at 631, 856 A.2d at 689 (citing *Langston,* 359 Md. at 437, 754 A.2d at 411). Furthermore, "blood or genetic testing under [FL] Section 5–1029 did not depend on any analysis of 'the best interests of the child' because, when an individual challenges a declaration of paternity in which he is named the father and then moves for a blood or genetic test, the trial court *must* grant the request." *Id.* at 632, 856 A.2d at 689–90 (citing *Langston,* 359 Md. at 435, 754 A.2d at 410) (emphasis in original). We considered as well that,

"[i]n 1997, the General Assembly . . . amended the 'Paternity Proceedings' subtitle of the Family Law Article, adding Section 5–1002(c), which states: 'Nothing in this subtitle may be construed to limit the right of a putative father to

file a complaint to establish his paternity of a child.' The Legislature added this language to Section 5–1002 for the purpose of 'clarifying that a putative father may file a paternity action.' 1997 Maryland Laws, ch. 609....

"The coalescence of *Langston* and the 1995 and 1997 amendments to the 'Paternity Proceedings' of the Family Law Article brings into question whether our holding in *Turner* has been invalidated so that the mandatory blood or genetic testing of Section 5–1029 is now available to challenge the paternity of a child born during an intact marriage."                                                     ˎ

*Id.* at 632–33, 856 A.2d at 690 (citation omitted).

We concluded, however, that these "expanded rights" of " 'putative fathers' ... to challenge paternity declarations ... do not apply to individuals in [Evans's] position," *i.e.*, individuals who are not "putative fathers." *Id.* at 629, 856 A.2d at 688. We turned to the Court of Special Appeals' opinion in *Stubbs*, 154 Md.App. 673, 841 A.2d 361, which had been issued only months earlier. Stubbs sought a blood test to prove that he was the biological father of a child conceived and born during the marriage of the mother and her husband. The intermediate court explained:

"Although 'putative father' is not a defined term in the Paternity Act, the quoted term has a settled legal meaning. Black's Law Dictionary defines 'putative father' to mean '[t]he alleged biological father of a child born out of wedlock.'

"That the dictionary meaning of 'putative father' was intended by the General Assembly when using that term in [Section 5–1002(c) ] is confirmed by construing subsection (c) compatibly with the balance of [Section 5–1002] to which subsection (c) was added."

*Evans*, 382 Md. at 633, 856 A.2d at 690–91 (quoting *Stubbs*, 154 Md.App. at 683–84, 841 A.2d at 367) (alterations in original; citation omitted). *Stubbs* concluded that the child "is not an illegitimate child, and Mr. Stubbs is not a putative father." 154 Md.App. at 688, 841 A.2d at 369. In *Evans*, we also noted

that *Stubbs* relied on the express purpose of the current Family Law statute "to 'promote the general welfare and best interests of children born out of wedlock.'" *Evans*, 382 Md. at 633–34, 856 A.2d at 691 (quoting *Stubbs*, 154 Md.App. at 684, 841 A.2d at 367 (citing FL § 5–1002(b). Further, the court in *Stubbs* had "extensively reviewed the legislative history of Section 5–1002(c), focusing specifically on the federal legislation that precipitated its enactment." *Id.* at 634, 856 A.2d at 691. The Court of Special Appeals had concluded:

> " 'Nothing in the text of [Section 5–1002(c)], or in its Maryland or federal legislative histories, indicates that the General Assembly intended to alter the *Turner v. Whisted* test for determining whether a blood test should be ordered under the circumstances presented here, or that the Federal Government intended to require, under the circumstances presented here, a mandatory blood test similar to that provided by [Section 5–1029].' "

*Id.* at 635, 856 A.2d at 691–92 (quoting *Stubbs*, 154 Md.App. at 688, 841 A.2d at 369–70) (alterations in original).

We agreed in *Evans* with the reasoning of *Stubbs* and applied it to the facts before us in *Evans* to hold that "the effect of Section 5–1002(c) does not reach the situation before us, where Evans seeks to establish paternity of a child born during a marriage." 382 Md. at 635, 856 A.2d at 692. We concluded, therefore, that *"Turner* . . . remains the controlling precedent for cases such as this, where two men (one the husband of the mother and the other a stranger to the marriage) acknowledge the paternity of a child born during a marriage." *Id.* at 636, 856 A.2d at 692.

*Kamp v. Department of Human Servs.*, 410 Md. 645, 980 A.2d 448 (2009), was an action brought by the Administration to increase support from Kamp for a child who was conceived and born during the marriage of the mother and Kamp. The mother and Kamp divorced over seven years after the child was born. A blood test, ordered by the circuit court, excluded Kamp from paternity, and the circuit court terminated his support obligations. Applying the *Turner v. Whisted*, 327 Md.

106, 607 A.2d 935, line of cases, this Court held that the circuit court had abused its discretion in ordering DNA testing, and that, even though the " 'cat is now out of the bag,' " the DNA test results "shall not be considered until doing so is determined to be in the child's best interests." *Kamp*, 410 Md. at 657, 980 A.2d at 464.[10]  In reviewing the Maryland law, this Court pointed out "[w]hen the child is 'born out of wedlock,' see [FL] § 5–1002(b), the applicable provisions are those found" in the paternity statute. *Id.* at 656, 980 A.2d at 454–55 (footnote omitted).

*Ashley v. Mattingly*, 176 Md.App. 38, 932 A.2d 757 (2007), is similar.  In that case, the child was born when the mother and her husband had been married for eight months.  The couple divorced, and the former husband subsequently sought and obtained blood testing in order to terminate his support obligations.  That testing excluded him from paternity.  Because the Court of Special Appeals could not "say that [the child] was necessarily conceived during the marriage," *id.* at 55, 932 A.2d at 767, it applied the presumption in ET § 1–206(a), which is based, alternatively, on birth during marriage. Accordingly, the court applied the *Evans, Turner,* and *Stubbs* line of cases and held that the circuit court erred in failing to recognize that it had discretion, under a best interests of the child standard, to deny blood testing.

There is considerable daylight between the issue presented in the instant matter and that in *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000).  There, this Court said, "We hold that the provisions of FL § 5–1029 are mandatory once a party to any paternity proceeding moves for a blood or genetic test." *Id.* at 435, 754 A.2d at 410.  *Langston* held that FL § 5–1038 not only permitted an enrolled judgment of paternity to be set aside based on a blood test that excluded the putative father, but that the provisions of that section were retroactive. *Langston* involved three cases in each of which the mother

---

**10.** Alternatively, this Court held that the divorced husband was equitably estopped from denying paternity.  *Kamp*, 410 Md. at 672–78, 980 A.2d at 464–68.

and the father were unmarried at the time of conception and of birth of the child involved. The *Langston* cases did not involve two men, each of whom claimed to be the biological father of the child. They involved mothers who asserted that the putative father was the biological father, and they involved putative fathers whose purpose in initiating the action was to set aside a support order.

In sum, none of the Maryland appellate cases have involved a claim of paternity by a man who was never the husband of the mother, a child who was conceived during the marriage of the mother and her former husband, birth of the child after their divorce, and an assertion by the mother and her former husband of the best interest of the child in opposition to blood testing requested by the paternity claimant. In resolving this issue here, we are mindful that the language used in the discussions in the cases reviewed above were written in a particular factual context and not necessarily to be extrapolated to other contexts.

## IV

In the instant matter, the heart of the rationale by the Court of Special Appeals is:

"The present case is distinguishable from the above cases because here, the child was not born during a marriage. Gracelyn was conceived when Mr. and Mrs. Mulligan were married, albeit separated, but she was born after they were divorced."

*Corbett,* 198 Md.App. at 58–59, 16 A.3d at 244. Further, that court said:

"The General Assembly, however, has provided that a 'putative father' of a child born out of wedlock has the right to bring a paternity action under the Family Law Article."

*Id.* at 59, 16 A.3d at 245. The court then concluded that "because Gracelyn was born out of wedlock, the Family Law Article was the proper statutory provision to address Mr. Corbett's request for genetic testing to determine Gracelyn's paternity." *Id.* at 60, 16 A.3d at 245. This holding is predi-

cated solely on the fact that Gracelyn's mother was divorced from her husband at the time the child was born.

Equating wedlock with matrimony, the court seems to have construed "born out of wedlock" literally and thereby failed to recognize that the phrase, when applied to a child, is a euphemism for an illegitimate child or a bastard. Ballentine's Law Dictionary (3d ed.1969) defines "born out of wedlock" to mean "[b]orn to an unmarried female; born to a married female but begotten during the continuance of the marriage status by one other than her husband."

In *J.A.S. v. Bushelman,* 342 S.W.3d 850 (Ky.2011), the court explained the term as follows:

"Historically, the phrase 'child born out of wedlock' is not a term of art, and seems to have come into common usage as a more acceptable modern substitute for 'bastard,' which over the years acquired the baggage of unrelated connotations. 'Child born out of wedlock,' like the word 'bastard,' has been used interchangeably with the term 'illegitimate child.' As shown below in Part V of this opinion, all three terms have been used historically to refer to a child whose biological parents were not married to each other, as well as a child whose mother was unmarried."

*Id.* at 856 n. 5. *And see Lathan v. Edwards,* 121 F.2d 183, 185 (5th Cir.1941) ("In common parlance, illegitimate child, 'natural child' and 'bastard' are interchangeable terms connoting a child born out of wedlock."); *Sweet v. Hamilothoris,* 84 Cal. App. 775, 258 P. 652, 655 (1927) ("A child born out of wedlock is an illegitimate child").

*Lewis v. Schneider,* 890 P.2d 148 (Colo.App.1994), involved the interpretation of a descent and distribution statute which provided that " '*a person born out of wedlock* is a child of the mother.' " *Id.* at 149 (emphasis in original). After concluding that no Colorado cases had construed the terminology, the court said:

"Other jurisdictions have interpreted the phrase to refer both to a child born to an unmarried woman and also to one born to a married woman but having a father other than the

mother's husband. *Estey v. Mawdsley,* 3 Conn.Cir.Ct. 491, 217 A.2d 493 (1966); *Wilkins v. Georgia Department of Human Resources,* 255 Ga. 230, 337 S.E.2d 20 (1985); *Johnson v. Studley–Preston,* 119 Idaho 1055, 812 P.2d 1216 (1991); *Pursley v. Hisch,* 119 Ind.App. 232, 85 N.E.2d 270 (1949); *Smith v. Robbins,* 91 Mich.App. 284, 283 N.W.2d 725 (1979); *Martin v. Lane,* 57 Misc.2d 4, 291 N.Y.S.2d 135 (N.Y.Fam.Ct.1968), *rev'd sub nom. on other grounds, Mannain v. Lay,* 33 A.D.2d 1024, 308 N.Y.S.2d 248 (1968[1970] ), *aff'd,* 27 N.Y.2d 690, 262 N.E.2d 216, 314 N.Y.S.2d 9 (1970); *In re Legitimation of Locklear by Jones,* 314 N.C. 412, 334 S.E.2d 46 (1985); *State v. Coliton,* 73 N.D. 582, 17 N.W.2d 546 (1945)."

*Id.* at 149–50.

The Court of Special Appeals cited no authority, and we know of none, for the proposition that a child conceived during a marriage but born after a divorce is a child born out of wedlock. Parents who divorce during the pregnancy of the wife do not, by the divorce alone, delegitimate their child. An English work, W. Hooper, *The Law of Illegitimacy* (1911) (Hooper), states that "if the efficient act of sexual intercourse falls within the marriage bond, legitimacy is presumed whether that bond continues or ceased as of the date of birth." Hooper at 154.

Judge Roszel Thomsen's opinion in *Metzger v. S. S. Kirsten Torm,* 245 F.Supp. 227 (D.Md.1965), bears on the divorce aspect of the problem before us. That was an admiralty case in which the court concluded that the libelant, the widow of a deceased stevedore, had proved that her husband's death was caused by unseaworthiness. The libelant had married the stevedore in July 1958. From April 1949 until August 1956, she had been married to one Poling. That marriage ended in divorce. Libelant's son, Roland, was born while she was married to Poling and another son, Harry, was conceived while she was married to Poling, but born after the divorce. The libelant claimed that both children were the children of the stevedore. Judge Thomsen held that the children must be considered the children of Poling and that they were not

entitled to any recovery for the death of the stevedore. Citing case law, Judge Thomsen held that "[u]nder Maryland law nonaccess by the then husband must be shown by other evidence than the testimony of the wife; her testimony on that point is not admissible." *Id.* at 233. Thus, divorce of the libelant from Poling did not mean, in and of itself, that Harry, the child whom the libelant was carrying at the time of her divorce from Poling, was born out of wedlock.

## V

The respondent in this case, William Corbett, contends that he is the putative father of a child born out of wedlock, Gracelyn. The determination that he seeks, in the terminology of Hooper at 152, is "adulterine" bastardy. Hooper's work on illegitimacy proposes the following as Rule I:

"A bastard is a person:—

"(a) Who is the child of an unmarried woman, a woman unmarried at the date of conception and birth of the child, and during the intervening period;

"(b) Who though conceived or born in wedlock has been proved by judicial process not to be the child of the husband."

Where the child is born to a mother who is unmarried at conception and birth and during the intervening period, there is no presumption of legitimacy. In cases of that type, prior to 1997, the Administration or the mother could require blood testing as a sword, to prove the paternity of the putative father, and the putative father could require blood testing as a shield "to determine whether [he] can be excluded as being the father of the child." FL § 5–1029(b). *Langston,* 359 Md. 396, 754 A.2d 389, was concerned with children born to mothers who had never married during any relevant period, and consequently presented no presumption of legitimacy. Thus, we said, in that context, that there was no best interests analysis before ordering blood tests. When FL § 5–1002(c) was added in 1997, it furnished a "putative father" with a sword, namely, to require blood testing under FL § 5–1029(b)

in order "to establish his paternity of a child" that was born out of wedlock. *Evans* makes clear that sword use of FL § 5–1029(b) does not extend to a self-proclaimed biological father of a child born in wedlock.

Where a third party to a marriage relationship seeks to use blood testing as a sword in order to prove his paternity of a child conceived during the marriage of the mother and her husband, it cannot be said, because of the presumption of legitimacy based on the time of conception, that the child was born out of wedlock, unless and until the presumption of legitimacy is overcome. Merely claiming to be the father of a child born out of wedlock, where the child was conceived during a marriage, does not overcome the presumption. In order to overcome the presumption, there must be proof presented within the framework of the rules set forth in FL § 5–1027(c)(2), (3), and (4) which read as follows:

"(2) The presumption set forth in this subsection may be rebutted by the testimony of a person other than the mother or her husband.

"(3) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, it is not necessary to establish nonaccess of the husband to rebut the presumption set forth in this subsection.

"(4) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, both the mother and her husband are competent to testify as to the nonaccess of the husband at the time of conception."

If a self-proclaimed father seeks blood testing in order to delegitimate a presumptively legitimate child, he must first show that blood testing is in the best interests of the child under the *Tucker–Evans* line of cases reviewed above. Unless and until the presumption of legitimacy is rebutted, a self-proclaimed father's application for a blood test relates to a legitimate child, *i.e.*, one born in wedlock, and the paramour is not a putative father under FL § 5–1002(c). So long as the presumption of legitimacy stands, the request for a

blood test under the circumstances here is to be analyzed under the *Tucker–Evans* rule. Consequently, the best interests analysis was required in *Evans* and *Stubbs* because the children there involved were presumptively legitimate, having been both conceived and born during marriage. Here, Gracelyn likewise is presumptively legitimate, based on her having been conceived during marriage.

Obviously, the best interests of the child issue must be raised, in order to have it decided, when a paramour seeks to prove his paternity of a presumptively legitimate child by requesting blood tests. *Cf. Toft v. Nevada ex rel. Pimentel,* 108 Md.App. 206, 671 A.2d 99 (1996) (mother of child conceived during marriage, while mother and husband living apart, brought paternity action against paramour for child support and obtained confirmatory blood testing, without express best interests analysis).

### Conclusion

For all the foregoing reasons, we hold that the circuit court did not err in performing a best interests of the child analysis when ruling on the Respondent's request for blood testing of a child conceived during marriage, where the mother and the presumptive father raised the best interests of the child issue. Accordingly, we shall vacate the judgment of the Court of Special Appeals and remand to that court for consideration of the other issues raised by the Respondent.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY RESPONDENT.**

BARBERA and RAKER, JJ., Dissent.

BARBERA, J., dissenting, in which RAKER, J., joins.

I dissent. I have a quarrel with certain of the reasoning of the Majority, as well as its ultimate conclusion that a child conceived during marriage, though born after her mother has divorced, was not "born out of wedlock," and, therefore, the

child's self-alleged biological father may not invoke the mandatory blood testing provisions of the Paternity Proceedings subtitle (Paternity subtitle), codified at Maryland Code (1999, 2006 Repl.Vol. & 2010 Supp.), § 5–1001 through § 5–1048 of the Family Law Article (FL) [1].

For reasons I explain, I agree with the Majority that the definition of a child "born out of wedlock" includes a child born to a mother who, although married, is not married to the child's biological father. But I disagree with the Majority that the term "born out of wedlock," as it is employed in the Paternity subtitle, is merely a euphemism for the term "illegitimate," as it is defined in Maryland Code (2001, 2011 Repl. Vol.), § 1–208 of the Estates and Trusts Article (ET), to refer to a child who was neither conceived nor born during marriage.[2] Further, I reject the Majority's requirement that a "putative father," that is, a man who alleges he is the biological father of a child born out of wedlock, must first demonstrate that the child was *in fact* born out of wedlock, by rebutting the presumption that the mother's former husband is the child's father, before that alleged biological father may proceed to establish his paternity of the child by invoking the mandatory blood testing procedures of the Paternity subtitle.

## I.

Before the General Assembly amended the Paternity subtitle in 1997, it was generally understood that an alleged

---

1. Unless otherwise indicated, all statutory references refer to the Family Law Article (FL) of the Maryland Code (1999, 2006 Repl.Vol. & 2010 Supp.).

2. I use the terms "legitimate" and "illegitimate" throughout my dissenting opinion solely because they are the terms employed by this State's statutes. I emphasize, however, that, although these terms retain legal significance, "all children are legitimate." *Evans v. Wilson*, 382 Md. 614, 646 n. 4, 856 A.2d 679, 698 n. 4 (2004) (Raker, J. dissenting). *See also* Cynthia Callahan & Thomas C. Ries, *Fader's Maryland Family Law*, § 9–2 n. 18 (5th ed. 2011) ("One wonders why the legislature does not re-title [Maryland Code (2001, 2011 Repl.Vol.), § 1–208 of the Estates and Trusts Article (ET)] as 'children of unmarried parents.'").

biological father could invoke only the provisions of the Estates and Trusts Article to establish paternity. *See Thomas v. Solis,* 263 Md. 536, 543–44, 283 A.2d 777, 781 (1971) (holding that the biological father of children conceived and born outside of marriage, and, therefore, illegitimate, could establish his legal relationship as their father pursuant to the Estates and Trusts Article); op. at 686 n. 8, 45 A.3d at 252 n. 8 (2012). During that same pre–1997 period, we decided *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992). In *Turner,* the self-alleged biological father of a child born, though not conceived, during the mother's marriage to another man filed to establish paternity under the Estates and Trusts Article and then sought court-ordered blood testing.[3] *Id.* at 109–10, 607 A.2d at 936–37. This Court concluded that "the Estates & Trusts Article provides an alternate avenue by which one could seek blood tests for the purpose of establishing paternity," and we held that, when a child is presumed legitimate and "two men each acknowledge paternity of the same child," then "an action to establish paternity is more appropriately brought under the Estates and Trusts Article." *Id.* at 113, 607 A.2d at 938. We reasoned that the statutory scheme set forth in that Article "presents the 'more satisfactory' and 'less traumatic' means of establishing paternity" when two men acknowledge paternity of a child (who was born during a marriage). *Id.,* 607 A.2d at 938 (quoting *Thomas,* 263 Md. at 544, 283 A.2d at 781; *Dawson v. Eversberg,* 257 Md. 308, 314, 262 A.2d 729, 732 (1970)). We then explained that, in order for Turner to establish his paternity, he would need to rebut the presumption that the mother's husband at the time of the child's birth was the child's father and a motion for blood testing (evidently to obtain evidence to rebut that presumption) would be "analyzed as a request for physical examination under Maryland Rule 2–423, and the court had discretion to grant or deny the blood tests." *Id.* at 938–39, 607 A.2d at 113 (footnote omitted). We further explained that a motion pursuant to Rule 2–423

---

**3.** As the Majority notes, Turner was precluded from proceeding under the Paternity subtitle. Op. at 686–87, 45 A.3d at 253 (2012).

would necessitate a showing of "good cause," which would require consideration of the various interests involved, including the alleged biological father's relationship with the child and the best interests of the child. *Id.* at 114–16, 607 A.2d at 939–40.

The year 1997 brought changes that precipitated a line of cases leading to the present one. In that year, the General Assembly enacted subsection (c) to § 5–1002 of the Paternity subtitle. That subsection provides: "Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child." We considered in *Evans v. Wilson,* 382 Md. 614, 856 A.2d 679 (2004), the effect of that legislative change on our holding in *Turner.* We recognized, as the Majority notes, op. at 690–91, 45 A.3d at 255, that the enactment of § 5–1002(c) had "changed the legal landscape." The specific question presented in that case caused us to determine the intended meaning of the term "putative father," as the legislature had provided no definition. As the Majority notes, op. at 692–93, 45 A.3d at 256–57, we adopted in *Evans* the definition of "putative father" embraced by the Court of Special Appeals in *Stubbs v. Colandrea,* 154 Md.App. 673, 841 A.2d 361 (2004). Judge Rodowsky, writing for the intermediate appellate court in *Stubbs,* explained:

> Although "putative father" is not a defined term in the Paternity Act, the quoted term has a settled legal meaning. Black's Law Dictionary defines "putative father" to mean "[t]he *alleged* biological father of a child born out of wedlock."
>
> That the dictionary meaning of "putative father" was intended by the General Assembly when using that term in FL § 5–1002(c) is confirmed by construing subsection (c) compatibly with the balance of FL § 5–1002 to which subsection (c) was added.

154 Md.App. at 683–84, 841 A.2d at 367 (emphasis added) (alteration in original) (citation omitted). We concluded in *Evans* that, because the child at issue was "born during a marriage," not out of wedlock, Evans was not a "putative

father" and, therefore, not entitled to mandatory blood testing under the Paternity subtitle. 382 Md. at 635, 856 A.2d at 692. That conclusion necessarily flowed from the *Evans* Court's premise (albeit unarticulated by the *Evans* majority) that the phrase "born out of wedlock," in the adopted definition of "putative father" quoted above, does not include a child who is born to a woman while she is married to a man other than the child's biological father. A man in that scenario, like Evans himself, would have to show good cause before blood testing would be ordered, pursuant to this Court's earlier decision in *Turner.*

Judge Raker penned a vigorous dissent to the *Evans* majority's decision. Among other criticisms, Judge Raker understood the majority's analysis and holding of that case, as do I, as improperly narrowing the category of men who could be "putative fathers" by excluding the self-alleged biological father of a child born to a woman who was married to another man. *See Evans,* 382 Md. at 649–50, 856 A.2d at 700–01 (Raker, J. dissenting) ("The majority and the *Stubbs* court simply assume that 'out of wedlock' has only one meaning—a child born to an unwed mother. Courts around the country have considered the meaning of this language and have interpreted the phrase to mean either a child born to an unmarried mother or a child born to a married woman but fathered by a man other than the mother's husband.").

The definition of "out of wedlock" (as well as "putative father") supported by Judge Raker in her dissent in *Evans* seems to be the definition the Majority endorses today. The Majority quotes the definition of a child "born out of wedlock" to include a child "born to a married female but begotten during the continuance of the marriage status by one other than her husband." Op. at 696, 45 A.3d at 258 (quoting Ballentine's Law Dictionary (3d ed.1969)). *See also* op. at 696–97, 45 A.3d at 258–59. What the Majority has done by adopting that definition of "born out of wedlock" negates, without saying so explicitly, the more narrow definition of the term that follows necessarily from the holding in *Evans, i.e.* a definition excluding children born to a married mother, though

begotten by a man other than the mother's husband. To the extent that today's decision rejects the more narrow definition of "putative father" employed in *Evans*, I agree with the Majority. I would prefer, however, that the Majority have made that explicit.

## II.

Although I agree with the Majority's endorsement of the definition of "out of wedlock" that includes children born to women married to men other than the children's biological fathers, I disagree with the Majority's definition of "born out of wedlock" as synonymous with the term "illegitimate." Consequently, according to the Majority, a child, such as Gracelyn, who was born to a divorced mother, though one who was married at the time of conception, is not "born out of wedlock" for purposes of the Paternity subtitle. The Majority's premise of synonymity between the terms is false and has led the Majority to a legal conclusion that undermines the express legislative policy of the Paternity subtitle.

The Majority correctly recognizes that Maryland law affords a choice between two statutory schemes to establish paternity, the Paternity subtitle and the Estates & Trusts Article. Op. at 672–73, 45 A.3d at 244. The Paternity subtitle, as expressed in its purpose clause, serves to determine the paternity of children "born out of wedlock," and to provide for their support and custody. *See* § 5–1002.[4] The subtitle also grants standing to putative fathers (as both the Majority and I

---

**4.** The legislative policy of the Paternity subtitle is expressed in FL § 5–1002:

(a) *In general.*—The General Assembly finds that:
(1) this State has a duty to improve the deprived social and economic status of children born out of wedlock; and
(2) the policies and procedures in this subtitle are socially necessary and desirable.
(b) *Purpose.*—The purpose of this subtitle is:
(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

define that term to mean the alleged biological fathers of children born out of wedlock, *see supra* ) to initiate complaints for blood testing. § 5–1002(c). Yet, notably, neither the Paternity subtitle nor the Estates and Trusts Article defines "out of wedlock" or "born out of wedlock," much less does either statute equate those phrases with the word "illegitimate." Moreover, none of our prior cases, nor those of the Court of Special Appeals, have specifically considered whether the term "born out of wedlock" is synonymous with the term "illegitimate," as the Majority opines it is.[5]

I do not disagree that some other jurisdictions have employed the phrase "born out of wedlock" synonymously with

---

(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock.

**5.** The circumstances of previous cases in which we, as well as the Court of Special Appeals, have discussed the issue of the two statutory schemes either concerned children who were born (and sometimes also conceived) while their mothers were married, *see Kamp v. Dep't of Human Servs.*, 410 Md. 645, 980 A.2d 448 (2009); *Evans*, 382 Md. 614, 856 A.2d 679; *Sider v. Sider*, 334 Md. 512, 639 A.2d 1076 (1994); *Turner v. Whisted*, 327 Md. 106, 607 A.2d 935 (1992); *Ashley v. Mattingly*, 176 Md.App. 38, 932 A.2d 757 (2007); *Stubbs v. Colandrea*, 154 Md.App. 673, 841 A.2d 361 (2004), or children who were neither conceived nor born to married mothers, *see Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000); *Monroe v. Monroe*, 329 Md. 758, 621 A.2d 898 (1993); *Taxiera v. Malkus*, 320 Md. 471, 578 A.2d 761 (1990); *Thomas v. Solis*, 263 Md. 536, 283 A.2d 777 (1971). Only in *Toft v. Nevada*, 108 Md.App. 206, 210–11, 671 A.2d 99, 101 (1996), did the Court of Special Appeals consider the circumstances of a child who was conceived by a married mother who had divorced by the time of the child's birth, *id.* at 214 n. 5, 671 A.2d at 103 n. 5, where the mother sought to establish paternity in a man other than her former husband, *id.* at 212, 671 A.2d at 102. In that case, the Circuit Court had proceeded under the Paternity subtitle and the issues presented to the Court of Special Appeals concerned the admissibility of the court-ordered blood testing, pursuant to the Paternity subtitle. *Id.* at 212–16, 671 A.2d at 102–04. The issues before the *Toft* court did not pertain to whether the Paternity subtitle was the appropriate statutory scheme by which to establish paternity, where the child's mother was married at the time of conception and the child, therefore, had a presumptive father, though the mother had divorced by the time of the child's birth.

the term "illegitimate." Nor do I disagree that other jurisdictions have statutes that specifically define a "child born out of wedlock" as an "illegitimate child," or provide a definition that follows this State's definition of "illegitimate." This interpretation, however, is certainly not universal. *See, e.g.,* D.C.Code § 16–907(a) (stating that " 'legitimate' or 'legitimated' means that the parent-child relationship exists for all rights, privileges, duties, and obligations under the laws of the District of Columbia"); D.C.Code § 16–907(b) (stating that "[t]he term 'born out of wedlock' solely describes the circumstances that a child has been born to parents who, at the time of its birth, were not married to each other"). *Cf. R.N. v. J.M.,* 347 Ark. 203, 211, 61 S.W.3d 149, 153 (2001) (recognizing that, although a child is presumed legitimate because he/she was either conceived or born to a married mother, a "putative father" has standing to litigate the issue of paternity). I therefore disagree with the Majority's position that the term "born out of wedlock," as related to the term "putative father," and when construed in the context of the provisions of this State's Paternity subtitle, *necessarily* is synonymous with "illegitimate," as that term is defined in the Estates and Trusts Article.

I believe, instead, that under Maryland law the terms are distinct: "born out of wedlock" describes the mother's marital status in relation to the child's biological father at the time of the child's birth, and "legitimacy" describes the legal status of the parent-child relationship. These distinct definitions, in my opinion, derive from the plain language of the Paternity subtitle.

The "primary goal" of statutory construction "is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision." *Moore v. State,* 424 Md. 118, 127, 34 A.3d 513, 518 (2011) (quoting *Ray v. State,* 410 Md. 384, 404, 978 A.2d 736, 747 (2009)). Statutory interpretation begins with "the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory."

*Id.,* 34 A.3d at 518 (quoting *Ray,* 410 Md. at 404, 978 A.2d at 748). "The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Proctor v. Washington Metro. Area Transit Auth.,* 412 Md. 691, 714, 990 A.2d 1048, 1061 (2010) (quoting *Bowen v. City of Annapolis,* 402 Md. 587, 614, 937 A.2d 242, 258 (2007)).

Section 5–1027(c)(1) of the Paternity subtitle recognizes that "[t]here is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception." [6] The inclusion of this presumption in

---

**6.** Section 5–1027(c) further provides:

(2) The presumption set forth in this subsection may be rebutted by the testimony of a person other than the mother or her husband. (3) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, it is not necessary to establish nonaccess of the husband to rebut the presumption set forth in this subsection. (4) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, both the mother and her husband are competent to testify as to the nonaccess of the husband at the time of conception.

The current version is an iteration of former Article 16, § 66F(b), enacted pursuant to the 1963 revisions discussed by the Majority. Op. at 673–75, 45 A.3d at 245–46. The former section provided:

When any bill or petition filed under this subtitle shall allege, or the court shall determine after the commencement of proceedings thereunder, that the child's mother was married at the time of the child's conception; the presumption that the child is the legitimate child of her husband may be rebutted by the testimony of persons other than the mother and her husband that, at the time the child was conceived, the mother was in fact living separate and apart from her husband.... After the court shall have determined that the child's mother and her husband were not living together as man and wife when the child was conceived, both the mother and her husband shall be competent to testify as to the nonaccess of the husband when the child was conceived.

Additionally, § 66G, entitled "Blood tests," provided that, "upon motion of the defendant alleged to be the putative father, or upon [the court's] own motion," the court "shall order the mother and the child, as well as the defendant to submit to such blood tests as may be deemed necessary to determine whether or not the defendant can be excluded as being the father of the child."

the Paternity subtitle evidences the legislature's intent that the procedures of that subtitle would be available in situations in which children have "presumed" fathers. For this reason, I cannot support expanding the definition of "born" also to mean "conceived." Only if the term "born out of wedlock" is afforded its plain language definition, that is, "born (not also born and/or conceived) outside of marriage," does the Paternity subtitle's presumption of legitimacy when the mother was married at the time of conception retain effect. If the term "born out of wedlock" is synonymous with "illegitimate," as the Majority concludes it is, then there would never be a matter arising under the Paternity subtitle to which the presumption in § 5–1027(c)(1) would apply. This is so because the Paternity subtitle is the statutory scheme for determining paternity of a child who is "born out of wedlock." Yet, as the Majority has decided, a child "born out of wedlock" is "illegitimate" and, therefore, has no presumed father. The Majority's analysis renders nugatory § 5–1027(c), which our rules of statutory construction do not tolerate.

A proper construction of the Paternity subtitle retains the presumption of legitimacy for a child conceived during the mother's marriage. Moreover, the statutory presumption of legitimacy for a child conceived during marriage is recognized in the Estates and Trusts Article, and it is not rendered nugatory or one bit undermined by the interpretation of the Paternity subtitle that I support. For example, a child conceived during marriage, but born after her presumed father has died, would benefit from the presumption of legitimacy under the Estates and Trusts Article for inheritance purposes.

In short, faithful adherence to the pertinent rules of construction requiring, here, application of the plain language of both the Estates and Trusts Article and the Paternity subtitle and the harmonious construction of each yields, for me, but one conclusion: The Paternity subtitle, at the time its provisions were originally enacted in 1963 through the adoption of the current versions, *see* op. at 673–77, 45 A.3d at 244–47, was and is intended to apply to decide contested paternity cases

for children whose biological parents were not married at the time of the child's birth.

### III.

Just as I reject the Majority's conclusion that "born out of wedlock" is synonymous with "illegitimate," I cannot subscribe to the Majority's reading into the law a requirement of a *preliminary determination* by the court that a self-alleged "putative father" is indeed a "putative father," by having rebutted the presumption of legitimacy, before he may invoke the provisions of the Paternity subtitle and obtain mandatory blood testing upon request. Op. at 698–700, 45 A.3d at 260–61. The Majority does not direct us to the statutory source of such a procedural requirement, and I could find none. In fact, the Paternity subtitle negates such a requirement.

To repeat, § 5–1002(c) provides: "Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child." That subsection expressly prohibits any interpretation of the Paternity subtitle that would limit a putative father's right to maintain an action under the subtitle and, fairly read, precludes imputation of a requirement that a self-alleged putative father first rebut the presumption of legitimacy before maintaining an action to establish paternity. The Majority, though, requires a self-alleged biological father to prove, first, that the child's presumed father is not, in fact, the child's biological father (to establish his own status as a "putative father," by proving that the child was "born out of wedlock"). Only then, according to the Majority, would the putative father have access to mandatory, court-ordered blood testing that would serve as the best evidence to rebut the presumption, *see Toft v. Nevada,* 108 Md.App. 206, 226, 671 A.2d 99, 109 (1996), and ultimately establish his paternity of the child.[7]

---

7. The Majority holds, in part, that, "[i]n order to overcome the presumption [of legitimacy of a child conceived during marriage], there must be proof presented within the framework of the rules set forth in FL § 5–1027(c)(2), (3), and (4)." Op. at 699, 45 A.3d at 260. *See Toft,*

That reasoning is circular and evades what, by its plain language, is dictated by the Paternity subtitle.

Moreover, the Majority's reasoning conflates the requirement of rebutting the presumption of legitimacy, which any alleged father must to do to establish paternity of a child who has a presumed father pursuant to either the Paternity subtitle or the Estates and Trusts Article, with the burden of demonstrating good cause, pursuant to Maryland Rule 2–423, to obtain discretionary blood testing when proceeding under the Estates and Trusts Article. I am unaware of any case explicitly holding that establishing good cause to obtain blood results evidence, which includes consideration of the child's best interests, is equivalent to overcoming the evidentiary hurdle of rebutting a presumption of biological fatherhood.

The Majority chides the Court of Special Appeals's decision in the present case because it would "delegitimate" children born after divorce. Op. at 697–98, 45 A.3d at 259. The Majority states that "[p]arents who divorce during the pregnancy of the wife do not, by the divorce alone, delegitimate their child." Op. at 697, 45 A.3d at 259. I disagree with the Majority's conclusion that the intermediate appellate court's decision would have that effect. Further, I disagree with the analysis of the Majority that leads to its flawed assessment of the intermediate appellate court's conclusion.

---

108 Md.App. at 224, 671 A.2d at 108 ("[T]he rules of evidence controlling the proof of paternity ought to be the same" whether proceeding in an equitable action pursuant to the Estates and Trusts Article or pursuant to the Paternity subtitle.) (quoting *Turner*, 327 Md. at 113, 607 A.2d at 938). I would hold that properly admitted blood testing results may be used, as well, to rebut the presumption of legitimacy found in § 5–1027(c)(1). *See Toft*, 108 Md.App. at 226, 671 A.2d at 109 ("[W]e conclude that the paternity statutes favor the use of blood test evidence, and would likely favor their use for rebutting the legitimacy presumption. Otherwise, the legislature would have created the potential for dueling rebuttable presumptions of paternity in two different men, with no 'trumping' mechanism. We do not believe that the legislature intended such an incongruous result."). Indeed, that is why I reject, as inconsistent with the scheme of the Paternity subtitle, the Majority's requirement that the presumption must first be rebutted.

The presumption of legitimacy holds for a child who is conceived during marriage under both the Estates and Trusts Article, *see* ET § 1–206(a)[8], and the Paternity subtitle, *see* § 5–1027(c)(1)[9]. That presumption remains *until rebutted.* Nothing in the Court of Special Appeals's decision implies that a divorce would rebut that presumption, by operation of law, particularly without an alleged biological father to fill the void. Nor does a self-alleged biological father's mere *filing of a complaint to establish his paternity* of a child operate automatically to rebut that presumption. Rather, the filing of a complaint pursuant to § 5–1002(c) solely affords the self-alleged biological father of a child born out of wedlock, that is, a child born outside of his or her biological parents' marriage, the opportunity to litigate the matter and rebut that presumption with the reliability and accuracy of genetic testing, if requested or ordered.

The Majority's requirement that a self-alleged putative father first prove he is a putative father yields the exact consequence the Majority purportedly seeks to avoid. The Majority, in effect, requires a court to delegitimate a child as a precursor to the self-alleged putative father's proceeding pursuant to the Paternity subtitle to establish ultimately his own paternity of the child. Proper construction of the statutory scheme, as I have outlined it, is one that would maintain the presumption of legitimacy unless and until the putative father could rebut the presumption, likely with the benefit of reliable genetic evidence.

## IV.

Finally, I believe that the Majority's opinion today requires the courts to ignore, to the derogation of the provisions of the Paternity subtitle, readily available, reliable evidence that

8. ET § 1–206(a) provides in pertinent part: "A child born or conceived during a marriage is presumed to be the legitimate child of both spouses."

9. Section 5–1027(c)(1) of the Paternity subtitle provides that "[t]here is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."

would prove the biological fact upon which the marital presumptions of legitimacy are based.[10] As Judge Eldridge opined in his dissenting opinion in *Turner*,

> In order for § 1–208(b) of the Estates and Trusts Article [the legitimation provision] to have a logical application, there cannot be a dispute as to whether the "parents" were married at the time of conception or birth. The provisions of the Estates and Trusts Article, because they were not designed to resolve an adversarial dispute between two men claiming paternity, require an assumption as to who is the natural father before a determination can be made concerning which section of the statute applies[,] [the presumption of legitimacy under § 1–206(a) or the legitimation procedure under § 1–208].

Because the Estates and Trusts Article *presumes knowledge of the identity of the natural* [i.e., biological] *father*

---

10. I would embrace the reasoning expressed by the Supreme Court of Connecticut in rejecting that state's recognition of an irrebuttable presumption of legitimacy. That court explained, in *Weidenbacher v. Duclos*, 234 Conn. 51, 661 A.2d 988, 997–98 (1995):

> The reasons for which the irrebuttable quality of this presumption originally sprang into existence do not justify its application today. Primarily, two factors motivated its adoption. First, the harsh treatment of illegitimate children motivated the state to avoid attaching illegitimate status to children. Second, the lack of a scientifically reliable method of determining paternity was a logical reason for presuming the husband's paternity. Today, however, society has come to recognize that discrimination against illegitimate children is not justified. The social stigma of being branded illegitimate, if indeed it remains at all, no longer carries the same sting that it once did. The United States Supreme Court, moreover, has held that illegitimate children cannot be denied equal protection of the law. *Trimble v. Gordon*, 430 U.S. 762, 776, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (holding unconstitutional intestacy statute that permitted child born out of wedlock to inherit only from his or her mother). *Furthermore, modern scientific tests can determine, with nearly perfect accuracy, who is the true biological father of a child. The original reasons which justified the adoption of the rule are no longer valid.*

(quotation marks and citations omitted) (emphasis added). I believe the Majority's analysis effectively treats the presumption under the Estates and Trusts Article as irrebuttable by requiring a third party to a marriage to first rebut the presumption before he can obtain reliable evidence to rebut the presumption.

*before its legitimation procedures become meaningful,* I cannot agree that the legitimation provisions of the Estates and Trusts Article are better suited to resolve a dispute between two men each claiming to be the natural father. It seems to me that the paternity provisions of the Family Law Article were better designed to resolve disputes over the identity of the natural father.

327 Md. at 121, 607 A.2d at 942 (Eldridge, J., dissenting) (emphasis added). As Judge Eldridge noted, the marital presumptions of the Estates and Trusts Article are premised on the underlying assumption that a woman's husband is her child's biological father. Those legitimacy presumptions still serve the important purpose of efficiently recognizing the father-child relationship in a number of situations, such as in the case of a married couple where the husband is the biological father and no other man alleges paternity. When a self-alleged biological father steps forward, however, to challenge those presumptions and establish his paternity of a child, the courts should not preclude his access to reliable evidence in the form of mandatory genetic testing. Such testing is available upon request under the Paternity subtitle to determine the truth of the fact underlying the marital presumptions, that is, the *biological relationship* between father and child.

I also take issue with the Majority's analysis because, effectively, it requires the Circuit Court judge first to reach the ultimate conclusion it deems most appropriate in order to receive, or preclude, evidence to support that pre-determined result. If a Circuit Court judge believes it is not in the best interest of the child for an alleged biological father to be determined to be the father, then, under the Majority's analysis, that judge will not order that genetic evidence proving that fact be obtained. Judge Eldridge provided a logical rejection of the *Turner* analysis in his dissenting opinion in that case, which Judge Raker cited, in part, in her dissent in *Evans, see* 382 Md. at 645, 856 A.2d at 698:

The majority has simply changed the law in a particular class of cases. The motivation for this departure apparently

is the desire to avoid a result which the majority perceives as an evil, to be rectified by judicial fiat, namely the declaration that a man, other than a married woman's husband, is the father of her child. Because the determination of the identity of the natural father of this child could lead to the natural father having some rights with respect to that child, and because such rights may impinge upon the "integrity of familial relationships already formed," the majority has reconstructed the principles which govern the resolution of disputes. Normally a dispute is resolved after the relevant facts are ascertained and the pertinent law is applied. Under the majority's construction, in this limited class of cases, sometimes the most relevant facts will not be ascertained in order to prevent an unsatisfactory resolution of the dispute. The father may bring an action to determine paternity but, in some cases, may not have access to the most germane evidence available to resolve this dispute, namely the results of the blood tests.

Nevertheless, according to the majority, if the man can prove that it is in the best interests of the child for him to be declared the father, blood tests will be provided. The majority has formulated a procedure whereby the trial court must determine the ultimate result, in order to discover whether that result is satisfactory, before it can ascertain the facts. If the court decides that it likes the predicted ultimate result, then the fact finding process continues. If the court decides that it does not like the predicted ultimate result, the process ends.

I cannot subscribe to the proposition that relevant, ascertainable evidence should be excluded because it may lead to a result which the court does not like. The trial court's conjecture over whether the result will be satisfactory should not determine whether facts relevant to that result are concealed. I simply cannot agree with the majority's view that the government (through its courts) is entitled to determine in a particular case that one will be better off by the perpetuation of a falsity and the suppression of relevant, unprivileged facts.

327 Md. at 123–24, 607 A.2d at 943–44 (Eldridge, J., dissenting) (footnote omitted). I agree with Judge Eldridge's dissenting analysis and believe it applies, even more so, at present day given that self-alleged biological fathers now have a right under the Paternity subtitle to file a complaint to establish paternity and invoke the subtitle's mandatory blood testing provision.

## V.

Turning to the facts of the matter *sub judice*, as gleaned from the evidence presented to the Circuit Court, I cannot support *any* analysis that would preclude Respondent from confirming and establishing legally his biological paternity of Gracelyn. Substantial, and essentially undisputed, evidence was presented to the trial court to support the alleged fact that Mr. Mulligan is not Gracelyn's biological father, and that Respondent indeed is. The failure to permit Respondent to confirm that fact with reliable genetic testing implicitly condones the Mulligans' decision for Mr. Mulligan to assume the role of Gracelyn's biological father, without actually believing he is and without regard to this State's adoption laws. At no time has Mr. Mulligan believed or maintained he is Gracelyn's biological father. Despite this, Petitioner and Mr. Mulligan evidently signed an "affidavit of parentage" with knowledge that Respondent could be, and likely is, Gracelyn's biological father.[11]

---

11. The import of an "affidavit of parentage" is delineated in FL § 5–1028. That section provides

(a) *In general.*—An unmarried father and mother shall be provided an opportunity to execute an affidavit of parentage in the manner provided under § 4–208 of the Health–General Article.

\*     \*     \*

(c) *Requirements for completion.*—(1) The completed affidavit of parentage form shall contain:

(i) in ten point boldface type a statement that the affidavit is a legal document and constitutes a legal finding of paternity;

(ii) the full name and the place and date of birth of the child;

(iii) the full name of the attesting father of the child;

(iv) the full name of the attesting mother of the child;

I recognize the Circuit Court found that Respondent acted aggressively and in a controlling manner with Petitioner and her children and that he provided virtually no support, save one month of housing, for Petitioner during her pregnancy. Still, those findings do not negate Respondent's status as Gracelyn's putative father. Those findings are relevant, instead, for purposes of analyzing Gracelyn's best interests when determining access schedules, provided Respondent is determined to be her biological father pursuant to the Paternity subtitle procedures he has invoked.

In addition to the Circuit Court's findings, evidence presented demonstrated that Petitioner believed Respondent to be Gracelyn's biological father and anticipated that he would sign the affidavit of parentage to establish that as legal fact when Gracelyn was born. When Respondent sought first to confirm his paternity through genetic testing at the hospital the day after Gracelyn was born, Petitioner denied his request, Respondent became upset, and Petitioner threatened to call

---

*(v) the signatures of the father and the mother of the child attesting, under penalty of perjury, that the information provided on the affidavit is true and correct;*

*(vi) a statement by the mother consenting to the assertion of paternity and acknowledging that her cosignatory is the only possible father;*

*(vii) a statement by the father that he is the natural father of the child; and*

(viii) the Social Security numbers provided by each of the parents.

\*　　\*　　\*

(d) Execution constitutes legal finding of paternity.—(1) An executed affidavit of parentage constitutes a legal finding of paternity, subject to the right of any signatory to rescind the affidavit:

(i) in writing within 60 days after execution of the affidavit; or

(ii) in a judicial proceeding relating to the child:

1. in which the signatory is a party; and

2. that occurs before the expiration of the 60–day period.

(2)(i) After the expiration of the 60–day period, an executed affidavit of parentage may be challenged in court only on the basis of fraud, duress, or material mistake of fact.

(ii) The burden of proof shall be on the challenger to show fraud, duress, or material mistake of fact.

(iii) The legal responsibilities of any signatory arising from the affidavit, including child support obligations, may not be suspended during the challenge, except for good cause shown.

(Emphasis added).

security.[12] In response, Respondent left the premises and sought legal counsel. Respondent's counsel initiated contact with Petitioner to resolve these issues within two weeks after Gracelyn's birth and, approximately three weeks thereafter, filed a complaint to establish Respondent's paternity. Mr. Mulligan testified that he assumed the responsibility of serving as Gracelyn's father after Respondent left the hospital without signing the affidavit. While this action is commendable, it is not the proper course to establish a legal parent-child relationship when there is another man all parties believe to be the biological father.

In *Sider v. Sider*, 334 Md. 512, 639 A.2d 1076 (1994), discussed by the Majority, op. at 688–91, 45 A.3d at 254–55, this Court noted that, after the mother and putative father obtained extrajudicial blood testing confirming the putative father's status as the child's biological father, *id.* at 516, 639 A.2d at 1078, "it appears that no further proceedings with regard to paternity were necessary" because "[t]he underlying facts in this case conclusively establish that [the alleged biological father] is [the child's] biological father" *id.* at 526, 639 A.2d at 1083 (footnote omitted). We found erroneous the Circuit Court's decision to deny the paternity petition and declare the presumed father the "natural" (i.e., biological) father because "[a] court's attempt to declare a third party to be the 'natural parent' of a child in a custody dispute is in effect a judicial adoption, which is not sanctioned in Maryland. Furthermore, the circuit court's decision had the effect of terminating [the biological father's] parental relationship with

---

12. The record reflects that, at some point before Gracelyn was born, Petitioner filed harassment charges against Respondent. Though the specifics of the allegations are not included, Petitioner explained, "He harassed me a lot and said things, very hurtful things about me and my family. And, um, to the point where I filed harassment charges against him." The charges ultimately were placed on the stet docket, evidently because Petitioner was concerned that, presumably, any conviction would impact negatively Respondent's employment as a recreation specialist with the Federal Bureau of Prisons. Evidently, as a consequence of these charges, some form of protection order was entered against Respondent for Petitioner's benefit.

[the child] which generally can only be accomplished through a decree of adoption." *Id.* at 529, 639 A.2d at 1084–85 (footnote and citation omitted).

Certainly the evidence presented in *Sider* was greater than the evidence presented in the matter *sub judice.* That was only possible, however, because the mother and biological father had agreed to undergo blood testing. I believe *Sider* is analogous, nevertheless, because the essential consensus by both Petitioner and Respondent, as well as Mr. Mulligan, is that Respondent *is* the biological father of Gracelyn. Indeed, Petitioner's position has been, not that Mr. Mulligan is Gracelyn's biological father, but rather that he is her "legal" father, and essentially, therefore, Respondent has no standing. The evidence presented to the Circuit Court, principally that Mr. Mulligan had a vasectomy before Gracelyn was conceived and Petitioner and Respondent engaged in sexual relations with the intent to conceive a child at the time Gracelyn was conceived, sufficiently supports the conclusion that Respondent, at the very least, is Gracelyn's putative father. Respondent is entitled, therefore, to maintain an action to establish his paternity through genetic testing under the Paternity subtitle.

## VI.

I would affirm the decision of the Court of Special Appeals remanding the matter to the Circuit Court to order blood testing pursuant to the Paternity subtitle of the Family Law Article because I believe Respondent is a "putative father." As the Majority seems to require a preliminary determination that Respondent is indeed a putative father in order to obtain blood testing, then I believe the proper recourse would be to remand the matter specifically for the determination of whether Respondent has rebutted the presumption, albeit without the availability of reliable court-ordered genetic testing. Yet, even under the Majority's analysis, I believe that Respondent already has presented sufficient evidence to rebut the presumption that Mr. Mulligan is Gracelyn's father, and therefore

has established himself as a "putative father" entitled to blood testing under the Paternity subtitle.

Judge RAKER has authorized me to state that she joins the views expressed here.